**BERRY BROTHERS CORPORATION,**
Plaintiff,

v.

**Paul L. SIGMON, trading as Sigmon Hosiery Manufacturing Company,**
Defendant.

Civ. No. 419.

United States District Court
W. D. North Carolina,
Statesville Division.

Argued June 19, 1962.

Decided July 21, 1962.

David Rabin and McNeill Smith, Greensboro, N. C., for plaintiff.

Richard Wynne, and John Finken, Washington, D. C., and J. P. Whitener, Hickory, N. C., for defendant.

CRAVEN, District Judge.

This is a case involving validity and infringement of patent No. 2,696,295 for a sock package owned by plaintiff. Plaintiff seeks damages for infringement of its patent and injunctive relief. Defendant counter-claims for a decree adjudging non-infringement and non-validity, and both seek costs and attorneys' fees.

The case was tried to the court without a jury. Upon the evidence, the stipulations, and the admissions of counsel, the court finds the facts to be as follows:

1. Jurisdiction of this action is based upon the patent laws of the United States (28 U.S.C. § 1338) and 35 U.S.C. §§ 271 and 281 for infringement of United States Letters Patent No. 2,696,295.

2. Plaintiff, Berry Brothers Corporation, is a North Carolina corporation having its principal place of business in Greensboro, North Carolina, and defendant, Paul L. Sigmon, trading as Sigmon Hosiery Manufacturing Company, is a resident of Catawba County, North Carolina, doing business at Hickory, North Carolina.

3. Plaintiff, Berry Brothers Corporation, is the owner of the entire right, title and interest in and to United States Letters Patent No. 2,696,295 for a sock package issued December 7, 1954 on an application filed by John C. Berry filed July 22, 1954. Plaintiff grants non-exclusive licenses for the manufacture and sale of sock packages under Patent No. 2,696,295.

4. Defendant received notice of the existence of United States Letters Patent No. 2,696,295 and that plaintiff claimed defendant infringed upon said patent.

5. The Berry patent, No. 2,696,295 entitled "SOCK PACKAGE" related to a sock package comprising a flat substantially stiff strip insert of sheet material having a configuration resembling that of a foot and ankle in vertically extended position, said insert having a substantially straight leading edge, and upper and lower trailing edges, said trailing edges connected to one another by a rearwardly projecting heel portion, a first sock enveloping and carried by said insert in a flat slightly tensioned state, and a second mating sock enveloping said insert and said first stocking in a flat, slightly tensioned state. The Berry package is sometimes referred to as a "2-on-1" package, and plaintiff admits that a single sock enveloping a flat insert in a slightly tensioned state is not covered by its patent. Indeed, during oral argument, in response to questioning by the court, plaintiff's counsel concede that no single element is new and contend only that the amalgamation or cooperation of old elements in a new combination constitutes the invention.

6. Prior to the Berry invention in 1953, stretchable nylon socks were being marketed in various types of packages including plastic tubes, cellophane bags, little cartons or boxes, and some laid out flat on the counter for display. The stretch socks, due to their elastic properties, contracted appreciably and were wrinkled, crumpled and unattractive in appearance. Stretch socks made of crimped nylon yarn particularly were unappealable to men as the appearance of

the sock resembled that of a sock which would fit a child only. The conventional manner for displaying socks on a counter permitted one sock to be separated from its mating sock.

7. The Berry patent application filed on July 22, 1954 contained claims 1 through 6, four of which related to a sock package, and two of which related to a package-forming machine, which claims were subsequently severed and with which we are not concerned.

Claim 1, as originally submitted, reads as follows:

"1. A stocking package comprising a flat strip insert having a configuration resembling that of a foot and ankle in vertically extended position, a first stocking positioned over and carried by said insert in a flat slightly tensioned state, and a second mating stocking carried by said insert and said first stocking in a flat, slightly tensioned state."

Claim 1 as finally allowed read as follows:

"1. A sock package comprising a flat substantially stiff strip insert of sheet material having a configuration resembling that of a foot and ankle in vertically extended position. *said insert having a substantially straight leading edge, and upper and lower trailing edges, said trailing edges connected to one another by a rearwardly projecting heel portion.* a first sock enveloping and carried by said insert in a flat slightly tensioned state, and a second mating sock enveloping said insert and said first stocking in a flat, slightly tensioned state." (underlining added)

The underlined portions of patent claim 1 above indicate amendments to claim 1 as originally submitted. The five italicized lines of claim 1 have the effect of adding a "substantially straight" relationship to the leading edge and of adding a "heel portion" to the trailing edge. These five lines make up the last amendment made to the claims following several interviews and other amendments over a period of about a month. The claims were allowed after the filing of this five line amendment.

8. With the aforesaid five line amendment the following "remarks" were filed with the patent office in explanation:

"The instant supplemental amendment has been drafted in the light of this conference in a sincere attempt to place the application in condition for immediate allowance.

"Some discussion was had as to the meaning of 'vertically extended portion'. In order to eliminate any possible misunderstanding and to render the claim more explicit, a modifying phrase has been added to the parent independent claim 1 which denotes that the leading edge of the sock is substantially straight with the upper and lower trailing edges united to one another by an outwardly projecting heel. It is believed that this language more concisely defines an element of the present invention.

"In view of the instant amendment, along with the first supplemental amendment and the principal amendment, it is believed that the instant application is in condition for immediate allowance, and an early action to this effect is respectfully requested."

9. A petition was filed with the Berry application requesting that the application be made special to advance the prosecution of it by reason of actual infringement then occurring.[1]

10. In the first official action on September 8, 1954, claims 1 through 5 were

---

1. As it subsequently turned out, the alleged infringing package was a "1-on-1" construction of the Interwoven type, which plaintiff now concedes to be non-infringing. The application to make special was granted, however, and the matter proceeded with some dispatch.

rejected as being unpatentable over Aberle 1,992,799 or Palmers. The Examiner's position was that the claims were broad enough to read on the Aberle patent, assuming it was well known to duplicate articles of clothing on an insert. The Examiner readily recognized that you could put two articles on one insert.

11. Ultimately, the Examiners withdrew their rejections of the claims, after amendment, and allowed the patent to issue.

12. Apparently the Examiner recognized the novelty of the Berry invention to be a single, unitary, saleable display package in which two socks were placed in a tensioned state on a single, disposable, cardboard insert. The concept of 2-on-2 is old. So, also, is the concept of displaying hose by inserting a piece of cardboard. But the combination of putting two stretch socks in a tensioned state on a single cardboard insert resembling the human foot apparently was considered by the Examiner to be a new combination and was the first time such a sock package had ever been known. It is perhaps important to note that the last amendment containing the words "heel portion" served to emphasize the appearance "resembling that of a foot and ankle".

As to the extent to which the claims ought reasonably to be limited by the doctrine of file wrapper estoppel, plaintiff's own opinion expressed by its patent attorney is especially persuasive. In a letter dated August 9, 1960 James Jones of Washington, D. C. expressed the following opinion to plaintiff's McNeill Smith:

"After a careful review of the packages, it is my firm opinion that both packages constitute a clear infringement of Berry patent No. 2,696,295 for the reason that it does have a heel portion."

13. Berry is thoroughly familiar with the operations of the hosiery industry in the manufacture and processing of hosiery from the knitting thereof through the toe closing, inspection, finishing, including pre-boarding and final boarding, pairing and packaging. Berry operated a converting business for hosiery and designed various hosiery boarding machines in order to expedite the boarding operations which are costly in the processing of hosiery.

14. In March of 1953, after forming cardboard inserts for a sock, Berry conceived of and reduced to practice a sock package in which the insert was formed of flat, flexible cardboard shaped in the form of a foot and a first sock enveloped the insert in a slightly tensioned condition and a second sock was placed over the first sock in a slightly tensioned and enveloping condition. Harold Collins, director of vocational training and education of the Durham schools, witnessed the formation of the first package made by Berry in March of 1953.

15. Sock packages embodying the Berry invention were produced by Berry for commercial sale in the summer and fall of 1954 after the filing of the Berry patent application. Immediately after placing the initial sock packages made in accordance with the Berry invention on the market in the Durham area, the sock packages met with consumer acceptance and reorders were placed immediately.

16. The first advertisement' for the Berry invention and BERRYPAK announcing the new sock package appeared on December 6, 1954 in the HOSIERY INDUSTRY WEEKLY describing and illustrating the new package in the unfolded as well as in the folded condition with two socks on a single insert. The hosiery industry was advised of the benefits derived from this novel package.

17. The response to the advertisement of December 6, 1954 by Berry Brothers Corporation revealing that Berry Brothers would license any company interested in making, using or selling such hosiery packages resulted in a large number of inquiries from mills located in the hosiery producing areas in the United States and Canada.

18. One of the inquiries after the advertisement that appeared on December 6, 1954 in the HOSIERY INDUSTRY

WEEKLY came from Max Rounick, a hosiery jobber in New York. Berry had no prior knowledge of or connection with Rounick or his firm, Ma-Ro Hosiery Company. Rounick subsequently met with Berry and his counsel and undertook to have the hosiery which he sold placed on inserts in accordance with the Berry invention and patent and instructed the sources from which he purchased hosiery to use the Berry package. Subsequently, Rounick ordered five million cardboard inserts to be used in conjunction with hosiery that he purchased for his jobbing concern.

Although Rounick did not own the mills that supplied him with hosiery, his position as a large purchaser made him influential in the industry. Rounick has received twenty percent of the gross royalties. Rounick agreed to advertise the sales of his stretch socks in the Berry package, and underwrite the purchase of five million inserts, so that mills from which he purchased would have a sure source of supply for his purchases. His company undertook to sell a million dozen Berry packages in 1955.

19. Since the commencement of the Berry Brothers Corporation licensing program after the patent issued on December 7, 1954, over two hundred hosiery mills have become licensees under the Berry patent, 2,696,295, including some of the largest hosiery mills in the country, such as Burlington Industries, Inc., Kayser-Roth, Inc., Slane Hosiery Mills, Inc., Triangle Hosiery Company, Inc., Crown Hosiery Mills, Inc., Adams-Millis Corporation, Koury Hosiery Mills, Inc., among others.

20. A total of approximately $900,-000.00 has been paid in royalty to Berry Brothers Corporation by Berry licensees under Patent No. 2,696,295. Approximately 500,000,000 pairs of hosiery packaged in accordance with the Berry invention have been manufactured and sold and royalties paid thereon to Berry Brothers Corporation since the issuance of the Berry patent in suit. The Berry sock package has achieved substantial commercial success and acceptance.

21. Berry has received patent protection for his invention in Canada and England and has received royalties from licensing his invention in Canada.

22. The Berry patent constitutes an advance in the art of packaging and displaying socks, and the Berry package is the first one that presented stretch socks to the consumer with an appearance simulating that on the leg of the wearer. The Berry package, together with the Power package [2], replaced the previous method of displaying and marketing men's stretch socks.

23. Some hosiery manufacturers, by using the Berry package, have been able to eliminate some operations of preboarding, inspection, and final boarding. However, this result does not flow from the package itself, but is brought about by various and sundry devices and apparatus which make it feasible to produce the Berry package on a mass production basis. It is possible to construct a Berry sock package by simply pulling one sock at a time over a piece of cardboard manually without the aid of a device or machine, but doing so is entirely impractical for achieving mass production for the simple reason that the hand method is slow and difficult to accomplish.

24. The prior art patents cited by the Patent Office Examiners are at least as relevant and pertinent as are any of the references on which defendant relies to show lack of invention or anticipation, with the possible exception of Causer, which will be explained herein below. None of the references cited by Patent Office Examiners or by the defendant, considered alone, teach the Berry package:

Aberle, No. 1,992,799 *is for an improvement in packaging ladies' full-*

---

2. Power Patent 2,748,930 is similar to the Berry package except of "1-on-1" concept, i. e., each sock is mounted on a single cardboard; curiously, one of the inserts used by Sigmon in this case (plaintiff's Exhibit 36) appears to be a Chinese copy of Fig. 1 of the Power Patent.

length sheer stockings in which a sheet of thin but stiff paper is cut to the shape of a stocking and inserted into *each* stocking for the purpose of retaining each stocking in a box in a flat condition so that the individual stockings in a box will not become disarranged in shipment. The individual stocking on each paper sheet will not become wadded or mussed during storage or shipment. Aberle's disclosure lacks disclosure of (a) a pair of socks in nexted and stretched condition on a single insert, (b) an insert capable of supporting a sock in tensioned condition, and (c) an insert having a configuration resembling that of a foot and ankle in vertically extended position.

Aberle, No. 2,067,111 is for a rolled stocking package shown in Fig. 1 in which a rectangular insert is placed only into the open welt of one stocking extending into the stocking for a very limited distance. A second mating stocking is placed over (on top of) the first stocking but displaced lengthwise so that only the forward edges of both stockings coincide for a substantial length but the foot portions are displaced relative to each other as shown in Fig. 5. The pair of stockings are then folded and rolled to form a cylindrical package that is ultimately covered with cellophane or comparable transparent material. This Aberle patent for a stocking package lacks all of the essentials disclosed and claimed by Berry including two socks on a single disposable insert having a foot configuration in extended form with the socks nexted and in stretched condition.

The Austrian patent to Palmers, No. 152,918, is, in some respects comparable to Aberle, No. 1,002,799, except the insert 2 shown in Fig. 2 omits a foot portion, while the showing in Fig. 5 incorporates a foot portion similar to Aberle, No. 1,992,799. No disclosure in Palmers suggests stretching or placing two stockings on a single insert.

Palmers and the Aberle patents are directed to the concept of forming and displaying hosiery packages within the same category of technology as the Berry patent. The ultimate product formed is to facilitate the display and marketing of hosiery in an attractive manner by the use of an inexpensive insert. However, the references do not disclose the Berry inventive concept or ultimate purpose as fully outlined in the Berry specifications.

25. Failing to find a sock package in related prior art in Class 206 where such products are classified, the Examiner conducted a further examination into nonanalogous art for structure or a combination that would support a rejection of the Berry claims. The Examiner cited from the art of finishing or drying wet socks in Class 223 subclasses 75, 77 and 84 a stretcher for socks and drying forms for wet socks and stockings, the Thus and Wadsworth patents revealing an awareness of such art:

Thus, No. 736,314 related to a "stretching device for stockings", as recited in claim, in which a pair of telescoping cylindrical tubes are supported for extension with a heel piece supported to receive the heel of the stocking mounted on the outside cylinder. Sock engaging pins are provided on the end of the inner cylinder to retain the open end of a sock as the cylinders are extended to stretch one or more stockings on the cylinders prior to mercerizing or singeing. The foot and ankle portions of the telescoping cylinders are collineated. The Thus stretching device is not extended to form a sock package but will support a sock thereon in a dry condition preliminary to further finishing operations. No sock package is formed.

Wadsworth, No. 1,332,368 is for a drying form for socks and stockings in which two flat sections made of wood or other suitable material, one for the foot portion and one for the ankle portion of a sock, are hinged together to permit folding of the stretcher and drier. Wadsworth's articulated drying form was designed to be conveniently stored away or carried in a soldier's box or kit bag. The preamble in Claim 1 of Wadsworth refers to the environment of the drying

form "for socks and stockings" and its use is directed to drying of wet socks, one or more.

26. As ancillary prior art the Examiner in the Patent Office cited the British patent of Breujel, No. 422,244, illustrating the display of a pair of gloves in which each individual glove is mounted on thin cardboard with only four glove fingers being supported on the flat fingers of the insert that is provided also with body and wrist portions. No suggestion appears in this patent for placing two nexted gloves on a single insert and that all portions of the glove will be stretched. The glove thumb is not mounted on the insert. The purpose of this patent for glove support is similar to the Aberle patent, 1,992,799 and is apparently for display.

27. Defendant's principal references to show anticipation are the references of (a) Causer, No. 2,354,849, for an articulated portable, foldable and extensible stretcher and drier, for wet socks, (b) Pecker, No. 1,943,741 for a stocking insert, (c) the drier for socks or stockings in Notion and Novelty Review of September 1939, p. 51 and (d) McLean, No. 2,736,473 for a stocking drier and stretcher.

Causer is classified in *Class 223*, subclass 77, the same place in which the Thus patent is classified as it related to a sock stretcher and dryer, not a sock package. The articulated, foldable and portable drying form of Causer is specifically described as a drying form to be made of water and moisture-proof material such as Masonite or like material illustrated by plaintiff's model P–40 and not the cardboard form presented by defendant's model D–8. Causer's three separate elements are hinged together providing compactness as more clearly shown in Fig. 6 of Causer to enable a soldier to carry it in a small space such as disclosed for the same type unit shown in Wadsworth cited by the Examiner. The dryer for socks and stockings of Causer and Wadsworth are equivalent to each other, but neither is intended or expected to be employed to display and market socks. Devices of the type shown in Causer, if ever made and sold, would be found on a notion counter or sporting goods store without any socks supported thereon. Such is the case with Wadsworth as devices of this type would be used with wet socks.

Causer is stressfully relied upon by defendant because it discloses *two* socks on one insert. But Causer is a dryer for wet socks rather than a display package for selling stretch socks. Only with hindsight can one say Causer anticipates the Berry sock package.

Pecker discloses a stocking insert for a single ladies' stocking with the foot portion of heavier material than the leg of the insert. The insert supports but a single stocking and the Pecker reference is no more significant than those of Aberle 1,992,799 or Palmers which are the full equivalent of Pecker.

Notion and Novelty Review of September 1939 on p. 51 shows a terry cloth covered wire frame foldable sock dryer and stretcher, presumably sold in pairs. Wadsworth embodies the same concept except for the terry cloth covering whether a single or a plurality of socks is placed on the dryer and stretcher.

McLean illustrates a stocking dryer and stretcher on which numerous stockings and socks may be placed at both ends thereof as it will accommodate more than one size. However, like Causer and Wadsworth, devices of the character shown in McLean are not employed for marketing socks or displaying them in the form of a sock package. McLean's stretcher for wet socks would be expected to be found also at a notions counter without any socks mounted thereon.

28. Although defendant cited numerous other references to hosiery boarding forms, garter displays, hair net packages, and a device for reshaping brassieres, these references clearly do not support a showing of anticipation of the Berry invention for a sock package, but do clearly show that putting more than one garment, whether socks or something else, upon an insert is not new.

29. All of the art cited by defendant is cumulative in effect and teaches no more than that cited by the Patent Examiners. It therefore fails to rebut the presumption of validity.

30. Defendant's expert witness is a practicing attorney who has in the past practiced as a patent attorney but he was not familiar with the knitting, processing, finishing or packaging of socks or with the problems faced by the industry in these arts. Knowledge to testify in this proceeding was acquired by defendant's expert only from an examination of the references and file wrapper submitted to him as he possessed no independent skill in the hosiery, knitting, finishing or packaging arts.

31. In January 1956, more than a year after the issuance of the Berry patent in December 1954, defendant first commenced to package socks by utilizing a single cardboard insert over which a single sock was placed. Two inserts with a sock on each insert formed a pair. Defendant continued to make such packages until 1959 when he converted to the Berry-type package of "two socks on one insert" as described and claimed in the Berry patent in suit. This change-over by defendant came after he received notice of plaintiff's rights and with full knowledge of the Berry package of "2-on-1".

32. Defendant employs the two-on-one sock package because it is practical in his type operation and is advantageous in this form to apply patterns or designs which cannot be effectively applied unless the individual socks are stretched. Defendant admits the "two-on-one" sock package facilitates production, is faster and less costly than prior methods.

33. Defendant has from time to time used various inserts having different configurations. Defendant's Exhibit 25 is a pair of child's stretch socks on an insert similar to Fig. 1 of the Berry patent except more of an angle type, viz., the leading edge is curved rather than straight and depicts more naturally the human foot and ankle as compared with the vertically extended position; the "heel portion" is obviously a heel and looks like one. The package is not folded over so that it appears in display form very much as the foot and ankle of a child. This defendant's Exhibit 25 infringes the Berry patent, and particularly so because the patent itself says that the collineated form shown in the drawings is the preferred form but that an angle type insert can be employed.

Plaintiff's Exhibit 36 is another insert used by the defendant and is almost identical in shape with Fig. 1 of the Power patent 2,748,930. Counsel stated during oral argument that this Exhibit 36 is the one chiefly being used by the defendant. Apparently packages made with this insert are always folded over. Defendant Berry's practice is to break the insert along the fold line. The court has examined many of these inserts and many packages made with them during the trial. When the folded package is open and the socks are allowed to be in a flat, unfolded condition, the stretch fabric of the socks exerts a longitudinal pull so that the insert cardboards overlap at least a half inch and sometimes as much as an inch; the resulting appearance bears no relationship to the heel of a human foot. Although terminology per se is of no controlling importance, the term "diaper bumps" used by defendant appears to be more descriptive than the term "heal portion", which is preferred by plaintiff. Sometimes the heel of the socks is positioned over the "diaper bumps"; sometimes the heel of the sock is partly below or above the "diaper bumps". Since defendant's packages made using plaintiff's Exhibit 36 are folded, and since the insert is broken into two pieces with the resultant overlapping, I am of the opinion that the heel part of the insert, by whatever name called, performs no display function and is of no display importance. The only function of any importance is that from which "diaper bumps" gets its derivation: to facilitate a paper wrapper adhering to and staying on the end of the folded package. The most that plaintiff can reasonably contend as to plaintiff's

Exhibit 36 is that if it is a heel portion, it is certainly a queer one and indeed no human ever walked on such a heel as this one appears to be. Defendant's inserts are provided with rounded v-shaped recesses or notches, one along the fold edge of the insert, and one at the rear edge of the insert, and I find that the purpose of the same is to provide the pair of "diaper bumps" to facilitate attaching the wrapper or "diaper" to the package. Neither in appearance nor function is this the same as or substantially equivalent to the heel portion of the Berry insert.

The Berry patent teaches a fold line in the middle of the insert. Defendant uses a deep score mark to permit separation of the insert. If this be deemed the full equivalent of the Berry fold line, it has the additional purpose of permitting separation of the insert. Unquestionably the physical separation of the insert completely overcomes the tendency of the sock package to open up. The tension of the stretch sock keeps the package flat, whereas if the insert remains integral the same stretching power tends to pull the package apart at the ends.

34. During the prosecution of the Berry patent application the claims, particularly claim 1, was modified to recite the *specific environment* of the invention to the *field of sock packages* as declared in the preamble of the claim and in the specifications. The contour of the insert at the trailing edge was modified to recite that the upper and lower edges thereof are connected by a rearwardly projecting "heel portion".

If this patent has a key, it is in these modifications. Within the environment of a sock display package these are the elements:

1. Two socks on one insert

2. An inexpensive, disposable, stiff insert

3. Resembling a human foot and ankle with a clearly delineated heel portion

All of these elements were old. Because of the tension in stretch socks this combination of old elements produced a new and useful manufacture—not obvious to those skilled in the art.

35. All of the evidence at the trial was directed toward claim 1 of the patent. Claims 2, 3 and 4 are subordinate claims, and if treated separately teach nothing new. Claim 2 teaches providing the insert with a folding line to permit folding the sock package upon itself. Claim 3 teaches the use of a paper rider over the open ends of the folded sock package. Claim 4 was never mentioned at the trial either in evidence or argument, and reads as follows:

"4. A stocking package in accordance with claim 1 wherein a plurality of woven ankle cuffs are detachably secured in encircling relationship to the outside surface of said package."

Suffice it to say claims 2, 3 and 4 are not new and are of no importance except as they may add a permissible element to the elements of claim 1. Indeed, counsel for plaintiff, in their Proposed Conclusions of Law, do not ask the court to find infringement except as to claim 1 and 2 of the Berry patent.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of the subject matter and of the parties.

2. Plaintiff, Berry Brothers Corporation, has good and valid title to Berry patent No. 2,696,295.

3. Claim 1 of the Berry patent No. 2,696,295 is valid.

4. Claims 2, 3 and 4 are subordinate claims to claim 1 and are valid only as such. Considered separately, claims 2, 3 and 4 are invalid and create no monopoly.

5. The statutory presumption of validity of the Berry patent is not overcome by defendant's citation of art, which citations are certainly no more pertinent than the references cited by the Patent Office, and are at best merely cumulative. The previous art does not disclose the Berry invention, and the subject matter

considered as a whole was not obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains. The Berry patent teaches a new and useful manufacture by combining old knowledge and applying it in a new way to the packaging of a new product (stretch socks). This assembly of old elements produced a surprising or unusual result which would not have been expected by a person having ordinary skill in the art.

6. The Berry patent is limited by its claims, that is to say the doctrine of file wrapper estoppel is applicable. Application of that doctrine to the facts results in different conclusions as to alleged infringing articles. Defendant's Exhibit 25 (a child's sock on an insert shaped like a child's foot) is held to infringe claim 1 of the Berry patent. Plaintiff's Exhibit 34 (a package of men's socks on a "Power" insert) is held not to infringe the Berry patent. Exhibit 36 exemplified the so-called "Power" insert, and is the principal insert used by defendant. Packages made using Exhibit 36 are held not to infringe the Berry patent. Defendant's Exhibit 42 is an insert for children's socks having no resemblance to a foot and ankle, and packages made with this insert are held not to infringe the Berry package.

7. Defendant has not deliberately infringed plaintiff's patent, but, instead, has honestly sought to avoid infringement and has succeeded in large measure. Upon motion of plaintiff, the court will appoint a Master to determine the extent, if any, of plaintiff's damages by an accounting. The court concludes that the measure of damages that ought to be applied in this case is a reasonable royalty for such use as may have been made of the invention by defendant, together with interest. Costs will be split between the parties. Attorneys' fees will not be awarded.

## OPINION

### Validity

If the Berry patent has validity, it is unquestionably that of a combina-

tion patent. Counsel for plaintiff concede that none of the elements are new. Whenever this is so it is a temptation to apply hindsight and to conclude that anyone skilled in the business might have done what Berry did. But the fact remains that no one had done it. Berry's sock package proved to be the answer to the problem of how to present attractively and sell stretch socks. "Where invention is clearly wanting, commercial success cannot lend validity to a patent. * * * Where, however, it appears that the claims of the patent contain elements of novelty and invention within the meaning of the Act, commercial success tends strongly to overcome the defense that what was done was obvious to other persons of great skill shown to have been working in the same field in an effort to accomplish the same objective." Otto v. Koppers Co., 4 Cir., 246 F.2d 789, 799–800.

In view of the fact that Berry produced a new and beneficial result never achieved before, viz., consumer acceptance of stretch socks by attractively presenting them in a new package, what was said in Webster Loom Co. v. Higgins, 105 U.S. 580, 591, 26 L.Ed. 1177, is peculiarly appropriate: "It may be laid down as a general rule, though perhaps not an invariable one, that if a new combination and arrangement of known elements produce a new and beneficial result, never attained before, it is evidence of invention."

As was said by the Court of Appeals of the Sixth Circuit in Western Electric Company v. North Electric Company, 135 F. 79, 89, " 'While the mere assembling in a new organization of parts of old structures to perform the same function in their new place that they did in the old is not invention, yet where they are so taken and are organized in a new and useful manner, so as to produce a more beneficial result, there may be invention; and when the combination displays the exercise of intuitive skill and genius beyond that possessed and exercised by those well skilled in the practice of their art, and the discovery is of something

new and useful, invention should be recognized' ".

The foregoing quotations are quoted with approval by our own Fourth Circuit Court of Appeals in Black & Decker Manufacturing Co. v. Baltimore Truck Tire Service Corp., 40 F.2d 910, 913.

In this case, defendant has offered in evidence many citations of prior art as the basis of its contention that plaintiff's invention is lacking in novelty. In regard to this contention, what was said by Chief Judge Parker in Reynolds v. Whitin Machine Works, 4 Cir., 167 F.2d 78, 83, is pertinent: "Such a citation of so many prior patents almost always means either that none of them is in point and that the patentee has brought together for the purpose of his invention devices to be found in prior patents of different character, or that there have been prior attempts to solve the problem with which he was confronted which have not met with success."

Judge Haynsworth in Merck & Co. v. Olin Mathieson Chemical Corp., 4 Cir., 253 F.2d 156, 165, quotes the United States Supreme Court in Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U.S. 428, 435, 31 S.Ct. 444, 447, 55 L.Ed. 527, 532: " 'Knowledge after the event is always easy, and problems once solved present no difficulties, indeed, may be represented as never having had any, and expert witnesses may be brought forward to show that the new thing which seemed to have eluded the search of the world was always ready at hand and easy to be seen by a merely skillful attention. But the law has other tests of the invention than subtle conjectures of what might have been seen and yet was not. It regards a change as evidence of novelty, the acceptance and utility of change as a further evidence, even as demonstration.' "

■ It must be remembered that the defendant is attacking a patent duly issued by the Patent Office. From this flows a presumption of validity, a presumption which is perhaps too often minimized in the courts. Georgia Pacific

Corp. v. U. S. Plywood Corp., 2 Cir., 258 F.2d 124, 133. The presumption of validity is entitled to particular weight when, as here, the file wrapper history discloses a careful consideration in the Patent Office before issue. All of the claims were initially rejected and were allowed only after substantial and restrictive amendments. There are two other factors of significance. Although commercial success is no substitute for inventiveness, it is an important factor in a doubtful case. Before Berry, stretch socks had not been generally accepted by the consumer. After Berry, stretch socks became an important segment of the hosiery industry.

There has been a long-continued public acquiescence in the validity of the Berry patent. "It is highly unlikely that a firm in a competitive industry would commit itself to pay such royalties if there was a substantial likelihood that the rest of the industry could manufacture the product free of the patent." Georgia-Pacific Corp. v. U. S. Plywood Corp., 258 F.2d 124, 134.

*Infringement*

Plaintiff stressfully contends that all of the defendant's sock packages infringe the patent and that the variation in the cardboard inserts and the corresponding shape of the package served no useful purpose and that defendant's sock packages are substantially equivalent, if not identical, to the Berry package.

■■ It is, of course, true that infringement cannot be avoided by the substitution for elements of a patented package other elements which are known equivalents in the prior art; and this is true even though the patent be a combination patent. Specialty Equipment & Mach. Corp. v. Zell Motor Car Co., 4 Cir., 193 F.2d 515, 518. The patentee of an invention of a combination of old ingredients is said to be entitled to equivalents, but only if the substituted element will perform the same function, and only if it was well-known as a proper substitute for the one described in the specification at the date of the patent.

One of the elements of the Berry patent, and indeed a very important one, is that the package shall resemble that of a foot and ankle with a heel portion. That this is an important element of the patent is obvious if one remembers the patent's primary purpose: to display stretch socks so that they will *sell*.

Defendant's "diaper bumps" are not the substantial equivalent of the heel portion. A package made using plaintiff's Exhibit 36 simply does not have the appearance of a foot and ankle. It must be conceded that in other respects there appears to be a substitution of equivalents:

(1) "Diaper bumps" hold a wrapper on the package, but so also does a heel portion when folded.

(2) The scored fold line used by defendant is the substantial equivalent of plaintiff's fold line. However, defendant's practice is to break the inserts at the fold line, and it cannot be denied that doing so accomplishes a different and useful result, viz., the tendency of the package to open up is destroyed.

In this invention the form of the package resembling a foot and ankle is of the essence of the invention. The claims of the patent are so limited and the range of equivalents is so narrowed by the cited prior art and by the last amendment emphasizing the resemblance to a foot and ankle by describing the heel portion, that what Sigmon does in the use of Exhibit 36 (the Power board) is not covered by the invention which it was the purpose of the patent to protect.

It is to be noted that the file wrapper discloses that the original wording of the first claim restricted the sock package to one having, by reason of the insert configuration, an appearance resembling that of a foot and ankle. Never was there an attempt to patent a sock package *not* resembling that of a foot and ankle. Instead, by the last amendment, patentee acquiesced in further emphasis to the foot and ankle appearance of the package by adding to claim 1 the following words:

"said insert having a substantially straight leading edge, and upper and lower trailing edges, said trailing edges connected to one another by a rearwardly projecting *heel portion*."

I cannot conceive of any purpose being served by this amendment except to satisfy the Examiner by making form and appearance of the essence of the patent. This viewpoint is confirmed by plaintiff's own patent attorney. See Findings of Fact No. 10. Since the question is one of construction of the claim, it is immaterial whether the Examiner was right or wrong in rejecting the claim as filed, or whether, indeed, Berry unnecessarily restricted his package claim to one resembling a foot and ankle.

It follows that Berry disclaimed a sock package comprising a flat strip insert with two socks enveloping the insert, and, instead, claimed only a sock package with those elements *plus* the element of resembling a foot and ankle with a heel portion. Berry now attempts, by recourse to the doctrine of equivalents, to secure through equivalents what has not only been rejected by the Patent Office, but, indeed, has never been claimed. The doctrine of file wrapper estoppel prevents application of the doctrine of equivalents to recapture coverage which the patentee has surrendered by amendment whether or not the prior art required the amendment. Carter Products, Inc. v. Colgate-Palmolive Company, 4 Cir., 269 F.2d 299, 304. It might be added that the doctrine of common sense prevents application of the doctrine of equivalents to obtain coverage which the patentee never claimed.

Counsel may submit an appropriate judgment in accordance with this opinion.