**BERRY BROTHERS CORPORATION,** Appellant and Cross-Appellee,

v.

**Paul L. SIGMON, trading as Sigmon Hosiery Manufacturing Company,** Appellee and Cross-Appellant.

**No. 8816.**

United States Court of Appeals. Fourth Circuit.

Argued Jan. 15, 1963.

Decided May 6, 1963.

McNeill Smith, Greensboro, N. C. (David Rabin, and Smith, Moore, Smith, Schell & Hunter, Greensboro, N. C., on brief), for appellant and cross-app·llee.

Richard G. Wynne, Washington, D. C. (John A. Finken, Washington, D. C., and Joe P. Whitener, Hickory, N. C., on brief), for appellee and cross-appellant.

Before SOBELOFF, Chief Judge, and HAYNSWORTH and BOREMAN, Circuit Judges.

SOBELOFF, Chief Judge.

The subject of this suit is a patent for a "sock package," that is to say, a package for the display of men's socks. The package consists of two socks, stretched one over the other on a stiff insert, so that the customer is presented with an appearance simulating the ankle and heel of a foot. The owner of the patent brought suit for alleged infringement. The defendant asserted invalidity of the patent and denied the alleged infringement. The District Court upheld the patent's validity and found infringement within a narrow scope, as to certain products of the defendant (Defendant's Exhibit 25), but concluded that most of the sock packages produced by the defendant did not infringe the plaintiff's patent (particularly Plaintiff's Exhibits 34 and 36).[1] Each side has appealed from the rulings adverse to it.

John C. Berry was issued patent No. 2,696,295 for the sock package upon his application filed on July 22, 1954. Berry Brothers Corporation of Greensboro, North Carolina, assignee of John C. Berry, is the plaintiff and Paul L. Sigmon, t/a Sigmon Hosiery Manufacturing Company of Hickory, North Carolina, is the defendant.

The problem to which the patent addresses itself is the attractive display of socks. In the conventional manner of displaying such merchandise for sale prior to 1953, there was a disadvantage in that it was difficult for the customer to visualize the appearance of the sock as it would be when in stretched, wearing condition. Also the units forming a pair were stitched or taped together and it was not unusual for a sock to be separated from its mate. With the advent of stretch socks, their elastic properties aggravated the problem, for when not under tension the socks were wrinkled, shrunken and unattractive in appearance.

Claim 1 of Berry's patent reads as follows:

"1. A sock package comprising a flat substantially stiff strip insert of sheet material having a configuration resembling that of a foot and ankle in vertically extended position, *said insert having a substantially straight leading edge, and upper and lower trailing edges, said trailing edges connected to one another by a rearwardly projecting heel portion,* a first sock enveloping and carried by

---

1. The District Court's opinion is reported at 206 F.Supp. 653 (1962)

said insert in a flat slightly tensioned state, and a second mating sock enveloping said insert and said first stocking in a flat, slightly tensioned state."

The italicized language, about which more will be said later, was added to meet objections of the Patent Examiner.

Claim 2, the only other claim with which we are here concerned, differs from claim 1 only in that "the insert is provided with a folding line positioned transverse to the long axis of said insert to permit the folding of the stocking package upon itself."

### Patent Office History

Shortly after Berry filed his application, there appeared in a trade paper an advertisement of the Interwoven sock package, which then seemed to Berry to infringe his device. He promptly requested the Patent Office to make his application special and its consideration was advanced. It turned out that Interwoven actually practiced the patent later granted to Power, No. 2,748,930, which was similar to Berry; but, as it mounted only one sock on each insert, the plaintiff now concedes that the Interwoven package does not infringe his patent.

In its original form Berry's application recited that his invention related to a stocking package, but at the instance of the Examiner the application was amended to limit it to the specific environment of a package for the display and marketing of men's socks and to exclude women's stockings. Throughout the application, where the word "stocking" appeared, it was stricken and the word "sock" was interlined but, through an obvious inadvertence, in one instance, the word "stocking" was not changed.

We attach no particular significance to this oversight because from the context the intention is plain beyond doubt.

Initially rejecting the application, the Examiner assigned several reasons. He thought the Berry package unpatentable over the prior art, citing particularly Aberle, No. 1,992,799,[2] and Palmers' Austrian patent, No. 152,918.[3] The Examiner expressed the view that it would not be invention to mount a second sock or stocking on such inserts as shown by Aberle or Palmers, or to stretch one stocking over another already stretched on an insert in "the manner in which a plurality of garments are sometimes placed on a single clothes hanger to conserve space." He raised further objections to the patentability of the Berry device. "The arrangement of the foot and ankle and the location of the fold line," the Examiner said, are "merely matters of mechanical choice and not patentable differences especially in view of Thus [4] and Wadsworth".[5]

In response, the applicant's attorney made a number of changes in the application and argued at interviews in the Patent Office and in written communications the uniqueness and inventive characteristics of the Berry package. He emphasized that placing two socks on a single insert in a tensioned state permits the maintenance of the socks thereon; and that this is of advantage to the customer "since it places the socks in a wearing state giving him a clear idea as to how they will appear when worn" and permits a better examination of the merchandise. Another characteristic which the attorney stressed is the construction of the insert, in which the angle and foot portions are "in a vertically extended position, with the leading or

---

2. Aberle's patent was for a paper filler for ladies' silk stockings and did not disclose a stiff, full form insert, but a softer material suitable for a rolled stocking package; nor did it teach the stretching of two socks over one insert.

3. Palmers, in some illustrations, shows a foot portion like Aberle, in others omits the foot portion entirely. He does not stretch two socks on a single insert.

4. The Thus patent, No. 736,314, relates to a stretching device used in the course of manufacture of the sock. It consists of cylindrical tubes, but it does not form a sock package.

5. Wadsworth, No. 1,332,368, is a drying form for socks and stockings. It is not a sock package.

forward edge straight." Further, he pointed out that Berry uses a substantially stiff insert that will tension and support the two socks "in a substantially erect state and in a flat, laid-out condition." Conceding that each element was old, he claimed for the Berry pack that the cumulative effect of these characteristics in combination was to form a new and useful article.

Addressing himself to the Examiner's citations to Aberle and Palmers, the attorney said that Aberle was closer than Palmers to Berry, but that even Aberle would not stand in the way of a patent. In distinguishing the Berry package from Aberle, he argued that Aberle is not directed to the formation of a sock package, but rather to means to maintain ladies' hosiery in a proper state when packaged in a box and the insert therefor is "a thin stiff paper." He further pointed out that in Aberle the ankle position is angularly disposed with respect to the leg portion, which is contrary to the applicant's insert; and that Aberle's device does not disclose or suggest the positioning of a stocking on an insert in a tensioned state, or the positioning of two separate pieces of footwear on a single insert to complete a formal stocking package. The Examiner was still not persuaded that Berry had a patentable invention over the prior art.

There followed further interviews with the Assistant Examiner and the Acting Primary Examiner, in the course of which "helpful suggestions" were made. Thereupon the attorney drafted and submitted a second supplemental amendment, saying:

"Some discussion was had as to the meaning of 'vertically extended position.' In order to eliminate any possible misunderstanding and to render the claim more explicit, a modifying phrase has been added to the parent independent claim 1 which denotes that the leading edge of the sock is substantially straight with the upper and lower trailing edges united to one another by an outwardly projecting heel. It is be-

lieved that this language more concisely defines an element of the present invention."

The Examiner apparently was satisfied that his objections had at last been met by this amendment and that, as restricted by the amendment, Berry's application disclosed an invention for which a patent should be allowed. The patent then issued promptly.

At first the application included claims for a package-forming machine, but these claims were deemed by the Examiner to relate to a distinct invention in a different classification. They were severed from the claims for the package, and the machine is not involved in this litigation.

*Events After Issuance of Patent*

A total of 200 licenses were issued and nearly $900,000.00 was paid in royalties upon 500,000,000 inserts up to the time suit was instituted. Much of this impressive success may have resulted, as the defendant maintains, from the promotional efforts of Max Rounick, a hosiery broker who early acquired a substantial interest in the patent and derived a personal benefit from exploiting it among the mills with which he dealt. His share in the royalties is 20%. Making allowance for this circumstance, it still appears that the patented device met with widespread acceptance by mills other than those served by Rounick. Some of these are large and powerful leaders in their industry who cannot be thought to have been dominated by Rounick. Significant too is the fact that retailers, noting the superior salability of products displayed in the Berry pack, shipped their stocks of merchandise, which had been packed in the conventional manner, to Berry for repackaging at their expense, including freight in both directions. The magnitude of these repackaging operations is not made clear in the record but apparently it was substantial. The decisions of these merchants to incur the additional expense was dictated solely by business considerations.

At trial the defendant also earnestly contended that commercial success is at-

704

tributable not so much to the Berry pack insert itself as to the machine for its manufacture, which made it simple and inexpensive to draw a pair of socks over the cardboard insert.

In the District Court additional prior art was cited by the defendant, none of which seemed to the judge, and seems to us, more relevant than the citations made by the Examiners during the application's course through the Patent Office. The closest to Berry was the Causer patent, No. 2,354,849, for "an articulated, portable, foldable and extensible stretcher and drier for wet socks," that becomes part of a package. It is made of a waterproof material, like masonite, and not cardboard. Causer's patent is no package, and is not intended for display and marketing, but for drying socks, like Wadsworth (see n. 5 supra), although it is notable that the inventor of the Causer device does suggest that two socks may be stretched on it at the same time. Also cited was Pecker, No. 1,943,741, a hose insert, reinforcing or stiffening the heel and toe portions by cardboard. Defendant put reliance on these two patents as disclosures not brought to the Examiner's attention, but to us it appears extremely unlikely that those features of these two patents which may be thought to bear resemblance to Berry were not already fully disclosed to the Examiner in the citations he considered, such as Alberle and Palmers.[6] If the Patent Office erred at all it was in the evaluation of Aberle and Palmers as anticipations of Berry, rather than in overlooking Causer and Pecker, which seem to us to teach no more than Alberle and Palmers taught.

■■■ Upon consideration of these debated issues the District Court concluded that the utility of the Berry pack is amply attested in the record. However, utility is not the equivalent of invention and patentability. Neither before nor since the enactment of 35 U.S.C.A. § 103 [7] have the courts been uniform in the application of a standard of patentability.[8] Even the congressional sponsors of the statute were not unambiguous in their statements as to its purpose in relation to earlier judicial pronouncements— whether merely to codify and carry forward or to modify existing standards.[9] The search for objective criteria for testing patentability has proved elusive. Little more has been said for our guidance than that a patent may not be obtained if, in light of the prior art, the subject matter as a whole would have been obvious at the time of the invention to a person having ordinary skill in the art. If there was such obviousness, the law will not favor the applicant with a monopoly and the privilege of exacting a tax from industry.[10] But the strict require-

6. Cf. Otto v. Koppers Co., 246 F.2d 789, 801 (4th Cir. 1957).

7. "§ 103. Conditions for patentability; non-obvious subject matter
   "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

8. See "The Standard of Patentability— Judicial Interpretation of Section 103 of the Patent Act," 63 Col.L.Rev. 306 (1963).

9. House Rep. No. 1923, 82d Cong.2d Sess. (1952); Senate Rep. No. 1979, 82d Cong. 2d Sess. (1952); Lyon v. Bausch & Lomb Optical Co., 224 F.2d 530 (2d Cir. 1955); Reiner v. I. Leon Co., 285 F.2d 501 (2d Cir. 1960).

10. Hotchkiss v. Greenwood, 11 How. 248, 52 U.S. 248, 13 L.Ed. 683 (1850); Atlantic Works v. Brady, 107 U.S. 192, 199, 2 S.Ct. 225, 27 L.Ed. 438 (1882); Great A. & P. Tea Co. v. Supermarket Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 95 L. Ed. 162 (1950); Lyon v. Bausch & Lomb Optical Co., 224 F.2d 530 (2d Cir. 1955); Reiner v. I. Leon Co., 285 F. 2d 501 (2d Cir. 1960); Brown v. Brock, 240 F.2d 723 (4th Cir. 1957); Honolulu Oil Corporation v. Shelby Poultry Company, 293 F.2d 127 (4th Cir. 1961); Entron of Maryland, Inc. v. Jerrold Electronics Corp., 295 F.2d 670 (4th Cir. 1961).

ment of a flash of creative genius [11] has been thought too severe and in excess of the demands of section 103.[12]

■■ It may well be that neither the statutory presumption of validity [13] alone nor the evidence of commercial success [14] alone would overcome the doubts raised as to this patent's validity; but taking the presumption and the evidence of commercial success together, we are led to accept the conclusion of the District Judge. We must, however, restrict the holding of validity to the very narrow scope defined by the patentee in the course of the proceedings in the Patent Office. The monopoly of the patent cannot be extended beyond the very combination for which the patent was issued.

■ Since the invention is claimed to reside in a new combination of old elements, the doctrine of equivalents can have only a restricted application.[15] This doctrine has its proper role to prevent evasions but it cannot be used to supply coverage where in substance the patent has excluded it. Exclusion need not always be made by striking out language; the addition of a qualifying phrase may achieve the same result, as in the second supplemental amendment where the qualification is explicit. We must fairly accord to the patent what is covered by its claims but the patentee cannot be permitted to assert a monopoly beyond the patent and in disregard of the limitations it embodies.

## Infringement

The plaintiff's unfolded package displays a clearly defined "rearwardly projecting heel portion" as described in claim 1. We agree with the District Court that the defendant's unfolded sock package (Defendant's Exhibit 25) infringes this claim of the patent. But the defendant's folded package does not present to the view of the customer a clearly delineated heel portion. In this version the projection is much reduced; and when the sock is folded, what there is of the heel portion is not readily recognizable as such. In the accused package (particularly Plaintiff's Exhibits 34 and 36) the projection is still further reduced until it cannot be said to resemble a heel at all. Mere reduction in the size of a feature does not ordinarily avoid infringement, but when the reduction goes so far as to make what remains of the feature utterly inconsequential in relation to the rest of the product, an essential characteristic of the patent has been effectively obliterated. There is then no infringement for there has been a departure from the patent. We agree that the use of the word "heel" need not be understood literally, for we often speak figuratively of an arm, a head, ribs, etc., without implying close resemblance to these parts of the human body. However, this is not a mere matter of nomenclature, for in a display package of a sock, when one speaks of a heel portion the necessary

11. Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 91, 62 S.Ct. 37, 86 L.Ed. 58 (1941).

12. Lyon v. Bausch & Lomb Optical Co., 224 F.2d 530 (2d Cir. 1955); Reiner v. I. Leon Co., 285 F.2d 501 (2d Cir. 1960). See Reviser's Note accompanying 35 U.S.C. § 103 (1958): "The second sentence states that patentability as to this requirement is not to be negatived by the manner in which the invention was made, that is, it is immaterial whether it resulted from long toil and experimentation or from a flash of genius." The tendency of this circuit has been in the same direction. Brown v. Brock, 240 F.2d 723 (4th Cir. 1957); Otto v. Koppers Co., 246 F.2d 789 (4th Cir. 1957); O.M.I. Corp. of America v.

Kelsh Instrument Co., 279 F.2d 579, 584 (4th Cir. 1960); Honolulu Oil Corporation v. Shelby Poultry Company, 293 F.2d 127 (4th Cir. 1961).

13. 35 U.S.C.A. § 282 provides, in pertinent part:
"A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it."

14. American Monorail Company v. Parks-Cramer Company, 245 F.2d 739 (4th Cir. 1957); Triumph Hosiery Mills, Inc. v. Alamance Industries, Inc., 299 F.2d 793 (4th Cir. 1962).

15. See Entron of Maryland, Inc. v. Jerrold Electronics Corp., 295 F.2d 670, 677 (4th Cir. 1961).

implication is of something that resembles, or at least suggests, in a general way the heel of a human foot. Moreover, since there are two slight protrusions or or "bumps," the appearance presented is even less that of a heel.

Dominant in the history of the patent is the insistence of the Patent Office that the applicant should specify the "outwardly projecting heel" and the applicant amended to comply. We are dealing here with a display package; obviously the heel was expected to suggest a human heel, and it could not perform this function unless this feature of the package was distinctly visible to the customer. When the package was folded and kept folded during display, as was the case when a hood label (diaper) [16] was used, *no heel could be seen by the prospective purchaser.*

■ It is to be remembered that the claimed novelty of the invention is in a combination of old elements. With the elimination of any of these the rest is no longer the particular combination of the patent. Specifically named as elements, without which the Patent Office would not have receded from its initial rejection of Berry's application, was the substantially straight leading edge of the insert, with the upper and lower trailing edges united to one another by an outwardly projecting heel. This feature Berry emphasized in the second supplemental amendment, which he filed after discussions with the Patent Office. Not until the claim was thus circumscribed, were the officials willing to acknowledge that the combination was inventive. Before the amendment was made, the Examiners considered that Berry showed only a stretching of two socks, one over the other, upon an insert. This, as we have seen, did not strike them as inventive. The amendment which brought in the heel tipped the scales in favor of the application. Whether the Examiners were right or wrong in their insistence on the amendment is immaterial. A patentee, having deliberately taken a position in the Patent Office proceedings to induce the grant of the patent to him, is not thereafter permitted to repudiate that position. This is what is meant by file wrapper estoppel.[17]

The plaintiff contends that in holding the patent valid but not infringed the District Court's judgment "keep[s] the promise of the patent to the ear while [breaking] it to the hope." Matthews v. Koolvent Metal Awning Co., 158 F.2d 37, 38 (5th Cir. 1947). The answer is that the promise of this patent is a very slender one and the court is not at liberty to amplify it.

We are disposed to agree with the plaintiff that the defendant, by merely tearing the insert along the scored line after the insert is enclosed in the socks, would not avoid infringement, if the folded package otherwise responded to claim 2 of the patent; but, as we have pointed out, the absence of the essential *"projecting heel portion"* differentiates the defendant's package from the patented article.

Our conclusion therefore is that except as to the unfolded sock package (Defendant's Exhibit 25) the plaintiff has shown no infringement.

### Counsel Fees

■■ It is only in an exceptional case that counsel fees are awarded to the successful litigants. 35 U.S.C.A. §§ 284, 285. The court committed no error in declining to award counsel fees to either party and in dividing court costs equally.

The judgment of the District Court is

Affirmed.

---

16. Jacobi patent, No. 2,816,653.

17. Power Curbers, Inc. v. E. D. Etnyre & Co., 298 F.2d 484 (4th Cir. 1962).

APPENDIX

Illustrations
of
Berry Patent

DE 25

Illustrations
of
Sigmon Packages