**John Donald MARSHALL and Horace L. Bomar, Trustees in an Agreement and Indenture of Trust known as the Carolina Patent Development Trust, Plaintiffs,**

**and**

**North American Rockwell Corporation, Additional Plaintiff,**

**v.**

**BAXTER TEXTILE MACHINES, INC., Picanol S.A., H. Bernard Hess, Picanol of America, Inc., and Pierce A. Cassedy, Defendants.**

**Civ. A. No. 2105.**

United States District Court, W. D. North Carolina, Charlotte Division.

May 11, 1970.

Henry N. Paul, Jr., James C. McConnon, Paul & Paul, Philadelphia, Pa., Channing L. Richards, Richards & Shefte, William E. Underwood, Jr., Ervin, Horack & McCartha, Charlotte, N. C., for plaintiffs.

Clifton T. Hunt, Jr., Hunt & Rhodes, Greensboro, N. C., Ernest S. DeLaney, Jr., Bradley, Gebhardt, DeLaney & Millette, Charlotte, N. C., for defendants.

## MEMORANDUM OPINION

McMILLAN, District Judge.

In 1954, United States patent #2,673,-575 (Plaintiffs' Trial Exhibit 78) was issued upon the 1951 application of Walter J. Budzyna and Americo Gouveia, inventors. The patent was assigned to Draper Corporation. Draper assigned legal title to the patent to plaintiffs Marshall and Bomar, trustees for Draper. North American Rockwell, the additional plaintiff, has succeeded to Draper's rights. References in this opinion to "Draper" include North American Rockwell.

The suit alleges that the defendants (collectively referred to as "Picanol") have been infringing and are infringing the patent. Treble damages, accounting, injunction and costs are demanded.

The defendants deny validity of the patent, deny infringement, and seek costs, attorneys fees, and damages for alleged misuse of the patent.

The patent includes various claims relating to devices for adjustment of the harness mechanism on power looms used in textile plants.

A loom is a machine which weaves threads into cloth or fabric. The principle of the loom is the same as the principle employed in the hand looms in use thousands of years ago. The details vary.

A modern loom (illustrated by photographs, Plaintiffs' Exhibits 75A and 75B) gets part of the thread or yarn which is its raw material from a large spool or "beam" around which are wrapped many yarn threads. These threads, comprising the "warp" of the fabric being manufactured, unroll parallel from the beam and pass horizontally through openings in small metal hangers called "heddles" which stretch vertically between the upper and lower horizontal bars of a frame called a heddle frame. The heddle frame looks something like a window sash suspended by straps from pulleys above. In a simple square weave, a loom would have two heddle frames. Their physical relationship to each other would be generally similar to the relationship of the two sashes of a double hung window. Half the yarn threads would pass through the heddles of one heddle frame, and half the threads would pass through the heddles of the other heddle frame. Each heddle carries alternate threads. Machinery is provided with cam action to pull each heddle frame alternately down a few inches, and then allow it to rise back up under spring tension from the clock springs in the harness mechanism above. This al-

ternate raising and lowering of the front and rear heddle frames produces a horizontal "V" opening or "shed" between the two groups of threads. The shuttle carrying the cross threads or "filling" passes back and forth horizontally through this "shed." The up and down alternation of the threads across the filling or cross thread is what produces the weave. Each passage of the shuttle or other thread-carrying agency through the shed is called a "pick."

Loom speeds vary from less than one hundred to as many as two hundred and fifty picks per minute. Because there has been no major break-through in weaving principles since the first shepherd wove the first coat, devices which produce a little more speed in doing the same old thing have been hailed with great acclaim in the industry.

The controversy in this case has nothing to do with the direct process of weaving which is briefly described above, but it has to do with the *adjustment* of the harness by which the heddle frames are raised; it deals with the *adjustment* of tension on the springs in the heddle's "top harness" which raises heddle frames to their "up" position.

Some weaves require four or six heddle frames or more. Each frame is raised to its particular desired height by a separate harness. Each frame in former years was supported usually by spiral or coil springs which in various former designs might connect with the top of the heddle frame directly and vertically, or horizontally and through a strap, or vertically to a strap which passes through a set of pulleys before connecting with the top of the heddle frame. As early as 1900, large spiral springs six to ten inches in circumference ("clock springs") were patented for use in raising heddle frames. As long as there were only two frames per loom the problem of adjustment of spring tension was manageable. The loom tender or "fixer" could adjust the tension on the individual springs supporting particular frames by making individual adjustment

at the end of each spring or at either end of the attached weight bearing strap.

As early as 1903, patent applications showed that the industry wanted better and safer methods of making *simultaneous* adjustment of all of the clock springs upholding the heddle frames on a particular loom. A simultaneous adjustment, by turning an outside shaft head, or gear handle, or lever, was obviously preferable to making separate adjustment of tension on four or six or more clock springs.

The simultaneous adjustment claimed under the plaintiffs' Draper patent and the simultaneous adjustment provided by the defendants' Picanol looms both include turning an external gear handle or external wrench attachment, thereby causing the rotation of an axle shaft which carries all the clock springs and, by thus rotating the shaft, tightening or loosening the tension on the springs.

The plaintiffs do not claim to have patent rights to the simultaneous adjustment of tension on multiple springs coiled around a common shaft.

The plaintiffs do not claim to have patent rights to the use of a gear and worm to produce the rotation and fixation of a shaft. Prior art and prior patents such as the Schaeffer patent (Plaintiffs' Exhibit 80) make such a contention untenable.

The plaintiffs do claim a "combination" of elements, all of which have been previously patented and all of which have been used in previous devices. It is the "totality" and "combination" of these elements which is alleged by the plaintiffs to be protected by the patent and infringed by the defendants.

The plaintiffs claim infringement of claims 1, 2, 4 and 5 of the patent (Plaintiffs' Trial Exhibit 78).

### CLAIMS 1 AND 2

Claims 1 and 2 read as follows:

"1. A spring top harness mechanism for looms comprising a supporting

casing, a shaft borne within said casing and a plurality of clock spring units carried on said shaft and within said casing, each said unit including a hub fixed to the shaft, a drum to which a harness cord is attached said drum being rotatable relative to said shaft and a clock spring having one end fixed to said hub and the other end fixed to the drum, and means comprising complementary, interengaging means a plurality of which form a part of said casing and at least one of which is carried by said shaft for releasably locking said spring units in a predetermined, tensioned relationship.

"2. A spring top harness mechanism for looms comprising a supporting casing, a shaft borne within said casing and a plurality of clock spring units carried on said shaft and within said casing, each said unit including a hub fixed to the shaft, a drum to which a harness cord is attached said drum being rotatable relative to said shaft and a clock spring having one end fixed to said hub and the other end fixed to the drum, and means for rotating said shaft to tension the springs and for retaining the springs in tensioned relationship comprising a member fixed to said shaft externally of the casing, said member having surfaces adapted to receive an instrument for applying torque to the shaft and *means* for releasably locking said spring units in a desired, tensioned relationship which comprises interengaging means part of which is a functionally integral part of the casing and another part of which is mounted on and movable with the shaft on which the spring units are affixed." (Emphasis added.)

The "specifications" (the general description in the patent apart from the claims proper) and the patent drawings (Plaintiffs' Exhibits 78 and 54) describe a method of rotating the shaft by using a wrench to turn an external flat-headed cap fitted onto the end of the shaft. They describe also a stationary ratchet and moveable pawl arrangement for lock-ing the common shaft in position and thereby regulating the tension on the clock springs. In a crude sense it resembles an old-fashioned spring-wound child's top. No reference is made in the patent to the use of a worm and gear.

The accused Picanol device is described in 1951 Belgian patent #502,849 (Defendants' Exhibit 216A) and in U. S. patent application #248,606, filed by Picanol September 27, 1951 (Plaintiffs' Exhibit 92). Plaintiffs' Exhibit 94 shows a cutaway drawing of the Picanol product. It consists essentially of a worm and gear arrangement for rotating and positioning a central shaft or axle on which common shaft several clock springs are mounted. The inner end of each clock spring is fastened to a hub fixed to the shaft, and the outer end of each spring is fastened to its own drum. Rotating the worm rotates the gear fixed to the end of the shaft, which rotates the shaft and the hub and increases or decreases the tension on all the springs simultaneously, and thus adjusts the amount of lift or upward pull which the springs exert on the heddle frames.

Plaintiffs claim that patent claims 1 and 2 cover the Picanol worm and gear arrangement.

The economic significance of the controversy is shown by the fact that the Draper ratchet and pawl device for adjusting heddle spring tension has apparently never been commercially successful; that only a few hundred were ever manufactured (in a United States market which includes nearly a third of a million looms); and that what Draper actually manufactures and sells is in fact a worm and gear adjusting mechanism substantially identical in principle and operation to the successful worm and gear mechanism first patented in Switzerland in 1951 by Picanol, and now being marketed by them in the United States.

The devices described in claims 1 and 2, and the worm and gear adjusting mechanism manufactured by Picanol and shown at the trial do substantially the

same thing—that is, make a simultaneous adjustment and fixation of a number of clock springs mounted on or rotatable relative to one central shaft. However, they do it in substantially different *ways* by the use of substantially different *principles* and by use of devices with substantially different *antecedents*.

The claims of the patent and the Picanol product both include a casing, a central shaft and several clock spring units carried side by side on the shaft. Both contemplate that the inner end of each clock spring will be fastened to a hub mounted on and rotating with the shaft and that the outer end of each spring will be fastened to an outer drum, so that the drum of each separate spring can rotate relative to the shaft, thereby changing the tension on the spring.

The first question is whether the worm and gear arrangement produced by Picanol can properly be held covered by the concluding language of claim 1 describing

"means comprising complementary, interengaging means a plurality of which form *a part of said casing* and at least one of which is carried by said shaft for *releasably locking* said spring unit \* \* \*." (Emphasis added.)

The court does not find that claim 1 covers the Picanol worm and gear arrangement:

(a) The Picanol worm and gear do not form "*a part of*" the casing; the shaft of the worm protrudes *through* a hole in the casing and rotates *within* that hole, but is not *a part of* the casing. (See Plaintiffs' Exhibit 94.)

(b) The worm and gear arrangement does not *release* under rotational pressure from the shaft. It operates like the worm and gear controls on an awning window or on the trim tab of an airplane; when the handle turns the worm, the worm turns the gear, and the gear is rotated to whatever position is desired; and the friction and leverage of the worm and gear keep it there. It is always locked in the position desired and is never "released." The "locking" is not "releasable."

(c) The worm and gear was not a new idea; it was not new to looms; and it was not new to the patent office. In fact, Picanol tried from 1951 to 1954 to get a United States patent on its worm and gear mechanism for adjusting clock spring tension on heddle frame harness mechanisms, and the idea was rejected as not being novel or original. The patent office, referring to previous patents held by Bahan and Peterson, said:

"*It is old to adjust the tension of a spring by means of a worm and gear.* Whether the spring to be adjusted be used to support a heddle frame or bias a cloth roll is not determined to be patentably significant." (Emphasis added.) (Plaintiffs' Exhibit 93, letter from United States Patent Examiner to Picanol attorneys, March 21, 1955.)

(d) The defendants provide a hand operated set screw which protrudes through a hole in the casing and can be tightened down against the shaft of the worm (Plaintiffs' Exhibit 94). The set screw protrudes through the casing but is not a "part of said casing"; it is not necessary to prevent undesired rotation or loosening of the worm shaft, and the court finds that it is not the agency through which is obtained the "releasable locking" of the spring units in a fixed state of tension in the sense described in the patent.

Claim 2, in pertinent part, covers:

" \* \* \* *means* for rotating said shaft to tension the springs and for retaining the springs in tensioned relationship *comprising a member fixed to said shaft externally of the casing*, said member having \* \* \* *means* for releasably locking said spring units in a desired, tensioned relationship *which comprises interengaging means part of which is a functionally integral part of the casing*

and another part of which is mounted on and movable with the shaft * *." (Emphasis added.)

In considering this claim, it is apparent that:

(a) The Picanol worm and gear arrangement does not have any member which is "fixed to said shaft externally of the casing."

(b) The Picanol locking arrangement does not have a part or means which is a "functionally integral part of the casing."

(c) The locking provided by the worm and gear is always fixed and is not "releasable."

(d) The considerations of the "oldness" of the idea apply to this claim also; the worm and gear is an ancient device, used in many machines.

The Picanol device does not infringe claim 1 or claim 2.

### CLAIMS 4 AND 5

Claim 4 and claim 5 both deal with an element of the mechanism which has nothing to do with its effective operation or desirability. Claims 4 and 5 read as follows:

"4. In a spring top harness mechanism for looms a casing, a shaft extending through and borne in said casing, means for retaining said shaft in an angularly adjusted position and a plurality of spring units carried by said shaft within the casing, each said spring unit comprising a flanged hub fixed to the shaft, a drum to which a harness cord is attached said drum being rotatably carried upon the said flanged hub and a clock type spring encased within said drum and having one end attached to the drum and the other end attached to the flange of said hub.

"5. In a spring top harness mechanism for looms a casing, a shaft extending through and borne in said casing, means for retaining said shaft in an angularly adjusted position and a plurality of spring units carried by said shaft within the casing, each said unit comprising a hub keyed to the shaft, a drum to which a harness cord is attached said drum being rotatably carried on said hub, a notch in said hub and an anchoring abutment forming a part of said drum, and a clock type spring confined within said drum and having one of its ends held in said notch and the other connected to said anchoring abutment."

It should be remembered that the basic construction of any clock spring unit is that the clock spring is wound in a spiral around a central shaft; that the inner end of the spring is attached to the central shaft (or to a hub or attachment fixed to the shaft); that the outer end of the spring is attached to the outer drum or casing within which the spring is confined; and that the drum and the shaft are rotatable relative to each other.

In both Draper claims 4 and 5, and in the Picanol device, there are an outer drum, an inner hub, a shaft, and a bearing to support the drum on the shaft [or on the hub]. In the Draper claims and in the Picanol device, the inner end of the coil spring is fastened to a notch in the inner hub and the hub is fixed to the central shaft by a key which requires the hub to rotate with the shaft. The adjustment of tension is accomplished by turning the shaft, which in turn causes the hub to turn, and this rotates the inner end of the spring and thereby increases or decreases the spring tension on the clock spring.

The only difference in principle between Draper claims 4 and 5 and the Picanol device is that in the Picanol device, the drum which contains the spring [and to which the outer end of the spring is fastened] is mounted *beside* the hub on the *shaft,* whereas in the Draper claims the drum is mounted upon a *flange* of the *hub,* which rests in turn directly on the shaft.

In the Draper claims the hub and the drum are concentric. In the Picanol device the hub and the drum are not concentric; each rides beside the other directly upon the shaft or upon its own

shaft bearing; and they are rotatable side by side relative to each other.

The bearing on which the drum rotates upon the shaft (Picanol), or upon a flange of the hub (Draper), is of no significance here.

The plaintiffs contend that because the Picanol hub and drum are side by side on the same shaft, and may rub against each other as they rotate relative to each other, the Picanol drum is therefore in the language of the patent, "carried upon" the hub. That appears to be a strained construction, and the court finds that the Picanol drum, side by side on the same shaft with the hub, is "carried upon" the *shaft* but *not* upon the hub.

The file wrapper of the Draper patent (Defendants' Exhibit 100, pages 11, 19, 23 and 24) is also enlightening. The *original* claims of the Draper *application* contemplated that the drum might be mounted upon or fixed to the *shaft;* the claim was *rejected* on the authority of three previous patents (some owned by Draper) covering clock springs with a drum mounted on a shaft. The claims which now comprise claims 4 and 5 were *amended* in the course of the patent office consideration so as to specify that each of the spring units in the claim must be rotatably carried on the *hub.* This shift from shaft to hub was necessary to get around the previous patents issued to Knox, Brown and Schaeffer. It is the mounting of the plaintiffs' drum on a flange of the *hub,* rather than upon the *shaft,* which the plaintiffs had to represent in order to get claims 4 and 5 through the patent office. *It was the revision of the claims to make this clear which induced the patent office to issue the patent.*

■ Having taken the revised and narrow position before the patent office that the essence of the invention was having the drum mounted on the *hub* instead of on the *shaft,* the plaintiffs will not now be heard to claim that their patent covers the *shaft mounted* drum of the defendants. Morpul, Inc. v. Glen Raven Knitting Mill, Inc., 357 F.2d 732 (4th Cir., 1966); Power Curbers, Inc. v. E. D. Etnyre & Co., 298 F.2d 484 (4th Cir., 1962); Berry Brothers Corporation v. Sigmon, 317 F.2d 700 (4th Cir., 1963).

It is true that in Patent column 5, lines 64 through 67, the specifications still refer to the fact that the drum *could* be mounted on the shaft. However, the specification can not outlive the forced abandonment of the claim to which the specification relates; and the specifications do not appear to be of any further legal significance.

■ If the Draper patent claims 4 and 5 are valid at all, they are not infringed by the accused Picanol device.

Whether considered individually or in combination, plaintiffs' claims do not cover the defendants' product. The court therefore does not now expressly rule upon the validity of the patent containing the claims.

All statements of fact in this Memorandum Opinion will be deemed findings of fact as may be necessary to support the conclusions of law and judgment.

The following exhibits are attached as exhibits to this opinion:

1. Plaintiffs' Trial Exhibit 75A, front view of a loom.

2. Plaintiffs' Trial Exhibit 75B, rear view of a loom.

3. Plaintiffs' Exhibit 78, sheet 1, figures 1 through 4, drawings from Draper patent #2,673,575.

4. Plaintiffs' Exhibit 78, sheet 2, figure 5, exploded drawing of plaintiffs' ratchet and pawl adjusting mechanism showing shaft, hub, drum, clock spring and the flange.

5. Plaintiffs' Trial Exhibit 94, part 1, exploded view of Picanol worm and gear adjusting mechanism.

[A2881]  1.   Plaintiffs' Trial Exhibit 75A, front view of a loom.

[A2882]  2.   Plaintiffs' Trial Exhibit 75B, rear view of a loom.

332

March 30, 1954          W. J. BUDZYNA ET AL          2,673,575

HARNESS MECHANISM

Filed June 9, 1951                              2 Sheets—Sheet 1

INVENTOR.
WALTER J. BUDZYNA
BY AMERICO GOUVEIA

ATTORNEY

3.  Plaintiffs' Exhibit 78, sheet 1, figures 1 through 4,
    drawings from Draper patent #2,673,575.

[A2884]

March 30, 1954      W. J. BUDZYNA ET AL      2,673,575
HARNESS MECHANISM

Filed June 9, 1951                    2 Sheets–Sheet 2

*THE FLANGE OF THE HUB*

PAWL — RATCHET — 28 — *BEARING* — 37 38 26 24

10 44 — 43 — 47 46 45 42 40 41 39 36 — 32 DRUM 33 DRUM 29 35 — 27 — 14 54 23 — *HUB* — *CLOCK SPRING*

Fig. 5

INVENTOR.
WALTER J. BUDZYNA
BY AMERICO GOUVEIA
Rodney C. Southworth
ATTORNEY

4.   Plaintiffs' Exhibit 78, sheet 2, figure 5, exploded
     drawing of plaintiffs' ratchet and pawl adjusting
     mechanism showing shaft, hub, drum, clock spring and
     the flange.

[A2883]

5.  Plaintiffs' Trial Exhibit 94, part 1, exploded view
    of Picanol worm and gear adjusting mechanism.

SET SCREW — CASING — GEAR — WORM — CASING — DRUM — BEARING — HUB — SHAFT — PLF's EXHIBIT 94 - PART 1

PICANOL CLOCK TOP
(PDX s 4A–IIA)

**334**

## JUDGMENT

Based upon the facts found and the conclusions expressed in the Memorandum Opinion which is being filed this same date, It is Ordered, Adjudged and Decreed:

1. That the accused Picanol device does not infringe claim 1, claim 2, claim 4 or claim 5 of the plaintiffs' patent.

2. That all claims of the plaintiffs for relief are denied.

3. That the plaintiffs pay all the costs involved in this litigation.

4. That although the evidence might support a claim of misuse, the court declines to find misuse, and the claim of the defendants for damages based upon alleged misuse is denied.

5. The court's interpretation of the patent claims as not covering the accused Picanol device makes it unnecessary to decide the validity of patent claims 1, 2, 4 and 5. However, the action is not dismissed but is held in abeyance pending appeal and for such action as may be appropriate after any appeal may have been decided.