The DUPLAN CORPORATION,
Plaintiff,

v.

DEERING MILLIKEN, INC., et al.,
Defendants.

DEERING MILLIKEN RESEARCH COR-
PORATION, Plaintiff,

v.

The DUPLAN CORPORATION and Bur-
lington Industries, Inc.,
Defendants.

The DUPLAN CORPORATION et al.,
Plaintiffs on the Counterclaim,

v.

DEERING MILLIKEN RESEARCH COR-
PORATION, Defendant on the
Counterclaim,

and

Deering Milliken, Inc., et al., Additional
Defendants on Counterclaim.

Civ. A. Nos. 71–306, 70–968, 69–1096, 68–
705, 69–777, 70–14, 70–189, 70–250, 70–295,
70–358, 70–385, 70–386, 70–391, 70–493,
70–622, 70–628, 70–677, 70–683, 71–87 to
71–102, 71–115, 71–126, 71–127 and 71–
283.

United States District Court,
D. South Carolina,
Spartanburg Division.

Nov. 14, 1973.

See also, 4 Čir., 487 F.2d 459; 334
F.Supp. 703; 353 F.Supp. 826, affirmed,
4 Cir., 487 F.2d 459, cert. denied, ——
U.S. ——, 94 S.Ct. 1565, 39 L.Ed.2d 574,
61 F.R.D. 127, reversed, 487 F.2d 480.

Edward P. Perrin, Perrin, Perrin & Mann, Spartanburg, S. C., David Rabin, McNeill Smith, Smith, Moore, Smith, Schell & Hunter, Greensboro, N. C., for Texfi Industries, Inc., Blanchard Yarn Co., Reliable Silk Dyeing Co., Dixie Yarns, Inc., Tex-Elastic Corp., Hemmerich Industries, Spring-Tex, Inc., Olympia Mills, Textured Fibres, Virginia Mills, Inc., Throwing Corp. of America.

Thomas A. Evins, Butler, Means, Evins & Browne, Spartanburg, S. C., Jay Greenfield, Simon H. Rifkind and David J. Brody of Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Deering Milliken, Inc., and Deering Milliken Research Corp.

Rufus M. Ward, Ward, Howell & Barnes, Spartanburg, S. C., Granville M. Brumbaugh of Brumbaugh, Graves, Donohue & Raymond, New York City, for Moulinage et Retorderie de Chavanoz, Ateliers Roannais de Constructions Textiles, (ARCT, France).

R. Hoke Robinson, Thomas T. Moore, Robinson, McFadden & Moore, Arthur O. Cooke, Cooke & Cooke, Greensboro, N. C., for ARCT, Inc.

W. Francis Marion, O. G. Calhoun, Haynsworth, Perry, Bryant, Marion & Johnstone, Greenville, S. C., John W. Malley, Wm. K. West, Jr., of Cushman, Darby & Cushman, Washington, D. C., for Burlington Industries, Inc., Madison Throwing Co., Inc., Leon-Ferenbach, Inc., National Spinning Co., Inc.

---

Fletcher C. Mann, Leatherwood, Walker, Todd & Mann, Greenville, S. C., Charles B. Park, III, Parrott, Bell, Seltzer, Park & Gibson, Charlotte, N. C., Anthony F. Phillips, Willkie, Farr & Gallagher, New York City, for United Merchants & Mfg. Inc., The Duplan Corp., The Schwarzenbach-Huber Co., Jonathan Logan, Inc., Frank Ix & Sons Va., Corp., Lawrence Texturing Corp., Burkyarns, Inc.

## ORDER

ON RENEWED MOTION BY BURLINGTON INDUSTRIES, INC. FOR SUMMARY JUDGMENT THAT U.S. PATENT 2,741,893 IS NOT INFRINGED BY USE OF ARCT FT MACHINES

HEMPHILL, District Judge.

Burlington's renewed[1] motion for summary judgment[2] of non-infringe-

---

1. A previous order for summary judgment of invalidity and non-infringement of this patent was refused as to the validity issue only by this court by order dated 12 January 1972. At that time discovery had not proceeded on the patent infringement issues in these cases. That discovery with exception of certain documents on which privilege is claimed (and on which no party relies for purpose of this motion) is now complete.

2. Pursuant to Rule 56, Federal Rules of Civil Procedure.

ment of United States Patent No. 2,741,893 invites decision by this court. Because of the complexity of this patent infringement litigation, the court feels it appropriate to review the guidelines to be followed where a summary judgment motion for infringement or non-infringement is being considered. It is elementary that a motion for summary judgment should not be granted where there is a genuine issue of fact to be resolved.

## STATEMENT OF APPLICABLE LAW

■ There is no dispute that the scope of a patented invention is defined[3] by the claims allowed by the Patent Office and appearing in the issued patent. A party directly infringes a patent by making, using, or selling the patented invention within the United States during the term of the patent without permission from a properly authorized party. 35 U.S.C. § 271(a) (1952). Direct infringement may be proved either by a literal reading on the patent claims or under the doctrine of equivalents.

## DIRECT INFRINGEMENT BY LITERAL READING ON THE CLAIMS

In determining whether an accused device infringes the patent, the court must initially look at the language of the claims. If the accused device falls clearly within a literal reading on the claims, there is direct infringement and that is the end of it. Graver Tank & Mfg. Co. v. Linde Air Products Co., 339

U.S. 605, 607, 70 S.Ct. 854, 94 L.Ed. 1097, 1101 (1950).

■ The construction of the patent claims is a question of law for the court. Doble Engineering Co. v. Leeds & Northrup Co., 134 F.2d 78, 83 (1st Cir. 1943); Vanderveer v. Erie Malleable Iron Co., 238 F.2d 510, 514 (3d Cir. 1957), cert. den., 353 U.S. 937, 77 S.Ct. 815, 1 L.Ed.2d 760; Cold Metal Process Co. v. E. W. Bliss Co., 285 F.2d 231, 239 (6th Cir. 1960), cert. den., 366 U.S. 911, 81 S.Ct. 1085, 6 L.Ed.2d 235 (1961); Solomon v. Renstrom, 150 F.2d 805, 808 (8th Cir. 1945); Del Francia v. Stanthony Corp., 278 F.2d 745, 747 (9th Cir. 1960). The court may have recourse to the patent specification, drawings, and file wrapper (a shorthand phrase used in the trade for the prosecution papers in the United States Patent Office) to discern the meaning of terms of art. Sometimes a term of art appears in the patent claims, the meaning of which is subject to dispute by those persons ordinarily skilled in the art. Since the patent applicant is his own lexicographer and his own grammarian, no genuine issue of fact as to the meaning of a term used in the claims will be considered by the court to exist if the meaning is made incontrovertibly clear elsewhere in the patent or in the file wrapper. Lincoln Stores, Inc. v. Nashua Mfg. Co., 157 F.2d 154, 158 (1st Cir. 1946), cert. den., 329 U.S. 811, 67 S.Ct. 623, 91 L.Ed. 692 (1947); Frederick Hart & Co. v. Recordograph Corp., 169 F.2d 580, 583 (3d Cir. 1948); Morpul, Inc. v. Glen Raven Knitting Mill, Inc., 357 F.2d 732, 736

3. See 35 U.S.C. § 112, infra. The appellate courts have consistently held that the claims of a patent, and not the specifications, measure the invention. Minnesota Mining and Manufacturing Co. v. Kent Industries Inc., 409 F.2d 99, 101 (6th Cir. 1969) (citing Milcor Steel Co. v. George A. Fuller Co., 316 U.S. 143, 62 S.Ct. 969, 86 L.Ed. 1332 (1942)); Ohio Citizens Trust Co. v. Lear Jet Corp., 403 F.2d 956, 958 (10th Cir. 1968). Bros Inc. v. W. E. Grace Mfg. Co., 351 F.2d 208, 213 (5th Cir. 1965) states: "For while the specification of the patent is indeed important, it must conclude with the claim and we, and all other courts, have often held that it is the claim of a patent that measures the invention so much so that each is (and must be) separable and distinct, each defining in effect a separate invention and each treated in law as a separate grant." See also Grant v. Walter, 148 U.S. 547, 13 S.Ct. 699, 37 L.Ed. 552 (1893). "A patentee abandons to the public that which is not claimed in the original or reissue patent as his invention or his discovery", General Motors Corp. v. Rubsam Corp., 65 F.2d 217, 221 (6th Cir. 1933).

(4th Cir. 1966); Chicago Steel Foundry Co. v. Burnside Steel Foundry Co., 132 F.2d 812, 814–815 (7th Cir. 1943); Strong-Scott Mfg. Co. v. Weller, 112 F. 2d 389, 394 (8th Cir. 1940); Bianchi v. Barili, 168 F.2d 793, 799 (9th Cir. 1948); Dominion Magnesium Ltd. v. United States, 320 F.2d 388, 394, 162 Ct.Cl. 240 (1963).

■ The doctrine of file wrapper estoppel has two different functions. The first function involves the use of the file wrapper to determine the meaning of a term of art. This differs from the application of the doctrine in the second manner or its classic sense as expounded by the Supreme Court in Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 62 S.Ct. 513, 86 L.Ed. 736 (1942). As to the first function, the lower federal courts have applied the doctrine so as to estop the patent owner, after asserting to the Patent Office that a term of art has one meaning, from later asserting to a court that the same term of art has a different meaning. Berry Brothers Corp. v. Sigmon, 317 F.2d 700, 706 (4th Cir. 1963); United States v. Cold Metal Process Co., 62 F.Supp. 127, 140 (N.D. Ohio 1945), aff'd, 164 F.2d 754 (6th Cir. 1947), cert. den., 334 U.S. 811, 68 S.Ct. 1016, 92 L.Ed. 1742 (1948); Chicago Steel Foundry Co. v. Burnside Steel Foundry Co., 132 F.2d 812, 814–815 (7th Cir. 1943); Myers v. Beall Pipe & Tank Corp., 90 F.Supp. 265, 268 (D.Ore.1948), aff'd per curiam sub nom. Fruehauf Trailer Co. v. Myers, 181 F.2d 1008 (9th Cir. 1950), cert. den., 340 U.S. 827, 71 S.Ct. 63, 95 L.Ed. 607.

The doctrine of file wrapper estoppel was elucidated by Judges Sobeloff, Haynsworth and Boreman affirming Judge Craven[4] in Berry Brothers Corp. v. Sigmon, supra, as follows:

Specifically named as elements, without which the Patent Office would not have receded from its initial rejection of Berry's application, was the substantially straight leading edge of the insert, with the upper and lower trailing edges united to one another by an outwardly projecting heel. This feature Berry emphasized in the second supplemental amendment, which he filed after discussions with the Patent Office. Not until the claim was thus circumscribed, were the officials willing to acknowledge that the combination was inventive. Before the amendment was made, the Examiners considered that Berry showed only a stretching of two socks, one over the other, upon an insert. This, as we have seen, did not strike them as inventive. The amendment which brought in the heel tipped the scales in favor of the application. Whether the Examiners were right or wrong in their insistence on the amendment is immaterial. A patentee, having deliberately taken a position in the Patent Office proceedings to induce the grant of the patent to him, is not thereafter permitted to repudiate that position. This is what is meant by file wrapper estoppel. 317 F.2d 700, at 706.

This court adopts and follows the direction of the Fourth Circuit.

## DIRECT INFRINGEMENT UNDER DOCTRINE OF EQUIVALENTS

■ If a mere colorable departure from a literal reading on the claims would avoid direct infringement, a patent would be turned into a hollow right. Graver Tank & Mfg. Co., supra, 339 U. S., at 607, 70 S.Ct. 854, 94 L.Ed., at 1101. Therefore the Supreme Court recognized the doctrine of equivalents. Winans v. Denmead, 56 U.S. (15 How.) 330, 14 L.Ed. 717 (1853). The doctrine necessarily arose after the Patent Act of 1836 required for the first time in the history of the United States patent system that an applicant make "claims" to his invention. This requirement has been carried through into the present Patent Act:

The specification shall conclude with one or more claims particularly

4. 206 F.Supp. 653 (W.D.N.C.1962).

pointing out and distinctly claiming the subject matter which the applicant regards as his invention. 35 U.S.C. § 112 (second paragraph) (1952).

The doctrine of equivalents states that there is a direct infringement of a patent claim if the accused device performs substantially the same function in substantially the same way to obtain substantially the same result. Union Paper Bag Machine Co. v. Murphy, 97 U.S. (7 Otto) 120, 125, 24 L.Ed. 935, 936 (1878); Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 42, 50 S.Ct. 9, 74 L.Ed. 147, 156 (1929). In Graver Tank Co., supra, 339 U.S., at 608, 70 S.Ct., at 857, 94 L.Ed., at 1102, the leading case on the doctrine of equivalents, the Supreme Court said:

> The essence of the doctrine is that one may not practice a fraud on a patent. Originating almost a century ago in the case of Winans v. Denmead, 56 U.S. (15 How.) 330, 14 L.Ed. 717 (1853), it has been consistently applied by this Court and the lower federal courts, and continues today ready and available for utilization when the proper circumstances for its application arise. * * * * A patentee may invoke this doctrine to proceed against the producer of a device "if it performs substantially the same function in substantially the same way to obtain the same result. * * * "
> The wholesome realism of this doctrine is not always applied in favor of a patentee, but is sometimes used against him. Thus, when a device is so far changed in principle from a patented article that it performs the same or a similar function in a substantially different way, but nevertheless falls within the literal words of the claim, the doctrine of equivalents may be used to restrict the claim and defeat the patentee's action for infringement.

The determination of whether the accused device is an equivalent of the patented invention is a question of fact. Coupe v. Royer, 155 U.S. 565, 579–580, 15 S.Ct. 199, 39 L.Ed. 263, 268 (1895);

Graver Tank Co., supra, 339 U.S., at 609, 70 S.Ct. 854, 94 L.Ed., at 1103. However, no genuine issue of fact is presented if it appears from the patent claims, specification, drawings, and file wrapper that extrinsic evidence in the form of testimony from those persons ordinarily skilled in the pertinent art is not needed to explain terms of art, or for evaluation of prior art, or to resolve questions of the application of descriptions to the accused subject matter. Thus, if the court is able from a mere comparison of the accused device with the patent claims to determine equivalency or non-equivalency, then the question of identity is one of pure construction, and not of evidence and, consequently, is a matter of law for the court, without any auxiliary matter of fact to be passed upon by a jury. Heald v. Rice, 104 U.S. 737, 749, 26 L.Ed. 910, 914 (1882); Singer Mfg. Co. v. Cramer, 192 U.S. 265, 275, 24 S.Ct. 291, 48 L.Ed. 437, 443–444 (1904); Sanitary Refrigerator Co., supra, 280 U.S., at 36, 50 S.Ct. 9, 74 L.Ed., at 153; United States v. Esnault-Pelterie, 303 U.S. 26, 30–31, 58 S.Ct. 412, 82 L.Ed. 625, 629 (1938).

Before entering into a determination on the issue of direct infringement under the doctrine of equivalents, the court must first examine the file wrapper to determine whether the patent owner is estopped to assert a charge of direct infringement against the accused device in suit. A patent applicant sometimes makes broad claims in his initial application filed in the Patent Office. If he thereafter amends his application to narrow the scope of the claims in order to obtain a patent, he cannot later charge direct infringement against a device which falls within the scope of the disclaimed or abandoned subject matter. This is the doctrine of file wrapper estoppel in its classic sense. Hubbell v. United States, 179 U.S. 77, 80, 21 S.Ct. 24, 45 L.Ed. 95, 98 (1900); Weber Electric Co. v. Freeman Electric Co., 256 U.S. 668, 41 S.Ct. 600, 677–678, 65 L.Ed. 1162, 1168 (1921); I. T. S. Rubber Co. v. Essex Rubber Co., 272 U.S. 429, 444,

47 S.Ct. 136, 71 L.Ed. 335, 343 (1926); Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 136–137, 62 S.Ct. 513, 86 L.Ed. 736, 744 (1942).

Thus, a patentee is not permitted recourse to the doctrine of equivalents where file wrapper estoppel is found. As the Supreme Court stated in Exhibit Supply Co., supra, 315 U.S., at 136–137, 62 S.Ct. at 518, 86 L.Ed., at 744:

> Whatever may be the appropriate scope and application of the doctrine of equivalents, where a claim is allowed without a restrictive amendment, *it has long been settled that recourse may not be had to that doctrine to recapture claims which the patentee has surrendered by amendment.* * * * By striking that phrase from the claim and substituting for it "embedded in the table" the applicant restricted his claim to those combinations in which the conductor means, though carried on [sic] the table, is also embedded in it. By the amendment he recognized and emphasized the difference between the two phrases and proclaimed his abandonment of all that is embraced in that difference. * * * The difference which he thus disclaimed must be regarded as material, and since the amendment operates as a disclaimer of that difference it must be strictly construed against him. (Emphasis added).

### SUMMARY JUDGMENT

This court is mindful of those decisions counselling caution in issuing summary judgment in cases involving patent claims, and that the summary judgment procedure is not generally applicable for disposition of such cases. Long v. Arkansas Foundry Co., 247 F.2d 366 (8th Cir. 1957) (combination issue under 35 U.S.C. § 112); Rankin v. King, 272 F.2d 254 (9th Cir. 1960) (patent declared invalid for lack of invention over prior art); Chiplets, Inc. v. June Diary Products Co., 89 F.Supp. 814 (D.N.J.1950) (motion for summary judg-

ment of infringement denied); Morpul, Inc. v. Glen Raven Knitting Mill, 357 F. 2d 732 (4th Cir. 1966) (file wrapper history examined). However, summary judgment may be employed where no genuine issue of fact exists, Morpul, Inc., supra; Stukenborg v. Teledyne, Inc., 441 F.2d 1069 (9th Cir. 1971) (patent claim held invalid for overclaiming), cert. den., 404 U.S. 852, 92 S.Ct. 90, 30 L.Ed.2d 92. On a motion for summary judgment, the function of the court ordinarily is to determine whether there is an issue of fact to be tried. In Engelhard Industries, Inc. v. Research Instrumental Corp., 324 F.2d 347, 352 (9th Cir. 1963) (ruling that file wrapper estoppel not preclusive of infringement claim), the court declared it is obliged to disregard affidavits containing only hearsay and legal conclusions. In Technograph Printed Circuits, Ltd. v. Packard Bell Electronics Corp., 290 F. Supp. 308, at 316 (C.D.Cal.1968), the court disregarded affidavits where "[n]one of the experts asserts that he has read the evidence and examined the physical exhibits. . . . " However, the function of the court is not to determine any fact which appears to be in issue. In Mont-Marquet v. Johnson & Johnson, 82 F.Supp. 469, 474 (D.N.J. 1949), aff'd per curiam, 179 F.2d 240 (3d Cir. 1950), the court stated:

> In the absence of triable issues of fact, there is no reason for not granting a motion for summary judgment in patent cases where infringement is charged. Rubinstein v. Silex Co., 73 F.Supp. 336 (S.D.N.Y.1947); Steigleder v. Eberhard Faber Pencil Co., 81 F.Supp. 143 (D.Mass.1948).

Therefore, it appears to this court that a motion for summary judgment for infringement or non-infringement may be granted in a patent case in any one of the four following situations so long as there is no genuine issue of fact to be resolved: first, where there is a file wrapper estoppel as to the patent owner's interpretation of the meaning of terms of art used in the claims, thus re-

moving the accused device as a literal direct infringement [5]; second, where no file wrapper estoppel exists and where there is no contest as to the meaning of terms of art but the accused device reads literally on the patent claims [6]; third, where the file wrapper estops the patent owner from asserting a charge of direct infringement under the doctrine of equivalents against the accused device [7]; and fourth, if there is no file wrapper estoppel, where the doctrine of equivalents can be applied by the court without the aid of extrinsic evidence [8].

## CASE HISTORY

Civil Action No. 71–306, pending in the District of South Carolina, is a consolidated multi-district patent-antitrust proceeding originally composed of 37 lawsuits [9], the first of which was filed in 1968. At least 20 patents are involved which are or were owned by Moulinage et Retorderie de Chavanoz (hereinafter Chavanoz), a French corporation doing business in the United States. Ateliers Roannais de Constructions Textiles (hereinafter ARCT-France), a French corporation manufacturing textile machinery and doing business in the United States; ARCT, Inc., a United States subsidiary of ARCT; Deering Milliken Research Corp. (hereinafter DMRC), the exclusive use-licensee of the Chavanoz-owned United States patents; and Deering Milliken, Inc. (hereinafter

DMI), a subsidiary of DMRC, are co-parties of Chavanoz. Although it is difficult at times to determine who is the plaintiff and who is the defendant on any one of the numerous causes of action in this case, the Chavanoz parties will hereinafter be referred to as the plaintiffs.

Opposing the plaintiffs are various purchasers and users of ARCT false twist [10] (FT) [11] machines. These parties will hereinafter be referred to as the Throwsters [12].

Originally, suit was commenced after the Throwsters refused to continue paying royalties to DMRC as the exclusive use-licensee of the patented processes allegedly used in the operation of ARCT FT machines, specifically, the patents involved in this action.

The multifarious issues have been divided by this court into two phases for separate trials. Phase I relates to monopoly, antitrust and patent misuse issues. Phase II relates to patent validity and infringement issues.

## THE MOTION

Burlington Industries, Inc., a Throwster, here renews its motions under both Phases I and II for summary judgment that United States Patent 2,741,893 (now expired) on a "Method and Apparatus for Producing Crinkled Yarn" was

5. Morpul, Inc. v. Glen Raven Knitting Mill, Inc., supra.

6. See Autogiro Co. of America v. United States, 384 F.2d 391, 181 Ct.Cl. 55 (1967).

7. See Parmelee Pharmaceutical Co. v. Zink, 285 F.2d 465 (8th Cir. 1961).

8. Vermont Structural Slate Co. v. Tatko Bros. Slate Co., 233 F.2d 9 (2d Cir. 1956), cert. den., 252 U.S. 917, 77 S.Ct. 216, 1 L. Ed.2d 123.

9. Eight additional complaints have been filed as of October, 1973.

10. Real twist results from holding a yarn at one end and twisting at the other end. False twist is different in that running yarn

is prevented from rotating *at* two points along its length but rather is caused to rotate *between* these two points by a suitable false-twisting machine. Hathorne, *Woven Stretch and Textured Fabrics*, at 4, 6 (Interscience Publishers 1964). (The book is Exhibit No. 1004 now before the court in illustration of deposition testimony.)

11. The designation FT refers to false twist machines which impart a false, as opposed to a natural, characteristic to synthetic yarns.

12. A Throwster is one who is primarily concerned with the processing of continuous filament yarns, preparing them for further processing into knitted and woven fabrics, carpets, etc. Hathorne, supra, at 7.

not infringed by its use of the ARCT FT machines because this particular patent is not incorporated therein and there is no genuine issue of fact to be resolved. This motion involves the first of the four situations listed above where this court considers a motion for summary judgment of infringement or non-infringement may be granted. The Throwsters contend that there is no genuine issue of fact to be resolved because there is a file wrapper estoppel as to the patent owner's interpretation of the meaning of terms of art in the claims, thus removing the accused device as a literal direct infringement.

The plaintiffs contend that their ARCT FT machines incorporate this patent and, therefore, there is a direct infringement from a literal reading on the claims. However, the plaintiffs oppose the motion for summary judgment on the grounds that genuine issues of fact exist as to the meaning of terms of art used in the patent claims which precludes the court from granting a motion for summary judgment.

## ANALYSIS

This patent (Exhibit No. 153) [13], appearing in the appendix hereto, is colloquially known as the "bathtub" patent because the invention relates to the production of a crinkled yarn by feeding the yarn in the form of substantially parallel thermoplastics filaments through a setting zone and then through a false twister. The setting zone may comprise a vessel of hot water, hence the phrase "bathtub" patent. (The illustrative drawing attached to the patent looks like an ancient bathtub.)

In determining whether there is direct infringement, this court initially examined the patent claims. The patent owner charges that claims 1 and 3 were literally infringed by the ARCT FT machines. These claims read as follows:

1. The method of producing a crinkled yarn from a bundle of substantially parallel, synthetic, thermoplastic filaments, which comprises passing said bundle through a heating medium, applying a false twist to the bundle in a twisting zone after emerging from said heating medium and while unconfined between said heating medium and said twisting zone to cause the twist to feed along the bundle backward into said heating medium, and confining the bundle to arrest the twist at a point within said heating medium to prevent the twist from feeding to the bundle in said medium in advance of the confining point, whereby the crinkle becomes set between the confining point and the false twisting zone and the twist disappears again after the bundle passes the twisting zone.

\* \* \* \* \* \*

3. Apparatus for producing crinkled yarn from a bundle of substantially parallel, synthetic, thermoplastic filaments, comprising a vessel containing a heating medium, means feeding the bundle through the medium in said vessel, a rotating member adapted to produce a false twist, means feeding the bundle from said vessel in an unconfined path through said rotating member whereby the twist in said yarn can freely feed backwardly into said vessel and twist arresting means in said vessel confining the bundle to prevent feeding of the twist to the bundle in said medium in advance of said arresting means whereby the crinkle is set in the filaments between said arresting means and said rotating member and the twist disappears after the bundle passes beyond said rotating member.

Claim 1 is an independent process claim and claim 3 is an independent ma-

13. The patent was first exhibited before the court in a book containing many patents, in the deposition of Robert Waters of ARCT, Inc., and given number 153 by the Clerk of Court. Subsequent introductions during depositions of others called for other exhibit numbers.

chine claim.[14] The alleged inventive feature of this patent is "to arrest the twist" (claim 1), or "twist arresting means" (claim 3), whereby the twist imparted to the bundle of filaments (see No. 1 on patent drawing) of the yarn by the false twister (see Nos. 7 and 8 on patent drawing) is prevented from feeding back to the yarn in the heating medium (hereinafter heater, see No. 4 on patent drawing) in advance of the twist arresting means (see No. 6 on patent drawing).

The application upon which the patent 2,741,893 is based generally disclosed prior art methods and apparatuses for applying a false twist to a travelling yarn, the twist in the yarn being set by the application of heat in a vessel of hot water or steam, the twist thus set, then being removed from the yarn after passing through the false twister. The resulting yarn is said to have a permanent "crinkle".

The claims originally filed with the application were broadly directed to the process and machine set forth in Finding No. 3, infra. These claims were rejected by the Patent Office on October 19, 1953, as shown by the Official Action of that date which appears at page 8 of the file wrapper.[15] On November 20, 1953, the applicants' attorneys sought reconsideration of claims 2, 3, 4 and 5[16], but rejection of all of the claims was affirmed by the Patent Examiner in a second Official Action issued February 21, 1955[17].

Thereafter, on August 18, 1955, the applicants' attorney cancelled all of the original claims, and proposed several new claims. In the "Remarks" accompanying these new claims, the attorney stated [18]:

It is to be noted that an important feature of the present invention is the provision of the roller 6 which constitutes a confining means in the heating medium (hot water) and *prevents the twist from passing to the horizontal portion of the yarn between the rollers 5 and 6.* This feature permits a high false twist to be imparted to the yarn to be set therein while at the same time it provides for plasticizing the yarn by the treatment throughout a fairly long path in the hot water so that it is in a plasticized condition for receiving the twist after it passes the roller 6. *By confining the twist to the distance between the roller 6 and the false twister 7* a comparatively high twist can be imparted to the yarn. (Emphasis added.)

In a third Official Action dated September 9, 1955, the Patent Examiner rejected all of the substitute claims, stating that this rejection was "MADE FINAL".[19]

Thereafter, on February 20, 1956 after an interview with the Examiner, the applicants' attorney made still further amendments to the remaining substitute claims which inserted the phrase "to arrest the twist" in the process claims, and inserted the terms "twist arresting" and "arresting" in the single machine claim.[20]

In the "Remarks" accompanying the amendment of February 20, 1956, the

14. Whoever invents or discovers any new and useful *process, machine,* manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title. (Emphasis added). 35 U.S.C. § 101 (1952).

A claim may be written in *independent* or *dependent* form . . . . (Emphasis added). 35 U.S.C. § 112 (second paragraph) (1965).

15. The official history of this patent application, i. e., its file wrapper, was introduced without objection during discovery depositions and marked as Exhibit No. 724.

16. Pages 9–11 of the File Wrapper, Exhibit No. 724.

17. Ibid, page 12.

18. Ibid, page 14.

19. Ibid., pp. 16, 17.

20. Ibid, pp. 18, 19. Also compare the handwritten amendments to the substitute claims at pp. 13 and 14.

applicants' attorney emphasized that the twist is stopped in the heater and that a substantial length of the yarn in the heater remains untwisted, using this language with respect to the amended claims [21]:

> This amendment is made as the result of an interview with the Primary Examiner and is intended to place the case in condition for allowance. It will be noted that the claims have been amended *to specify that the bundle is composed of substantially parallel, thermoplastic, continuous filaments,* also that the crinkle is set in the twisted bundle. The crinkle remains but the twist disappears after the bundle passes the false twister. *The claims also specify that the twist arresting device stops the twist in the heating zone so that a substantial length of the bundle in the heating zone remains untwisted* with the filaments substantially parallel. Due to the fact that synthetic thermoplastic filaments are poor heat conductors *it is important to heat the bundle while in untwisted condition.* Otherwise, the filaments are not uniformly heated and brought up to the desired temperature because they are too closely packed for the heat to penetrate the bundle. In the present case, by arresting the twist [in advance of] the preheating area, efficient operation takes place. *None of the citations discloses* a construction wherein synthetic, thermoplastic, continuous *filaments are heated in an untwisted parallel bundle* prior to the false twisting and in the absence of a chemical treating medium. (Emphasis added).

Following the filing of this amendment, the three substitute claims in the application were allowed by the Examiner on March 2, 1956, and the patent issued on April 17, 1956, containing only these three claims. This twist arresting feature was not mentioned in the original application. It was only after three rejections of the application by the United States Patent Office [22] and an interview with the Examiner, that the application was amended to recite and urge this twist arresting feature as the alleged novelty which distinguished the application from the prior art [23]. This feature of "twist arresting" within the heater was the sole feature of novelty on which this patent was granted.

It is established by the undisputed evidence and testimony that in the actual use of the ARCT FT machines, as purchased and operated by Burlington, there is no twist arresting device nor operation which stops the twist in the heater nor is there any heating of a length of the yarn in the heater in an untwisted condition. On the contrary, there is undisputed evidence and testimony that in the actual use of these ARCT FT machines, as purchased by Burlington, the twist which feeds backwardly from the false twist device is not stopped or arrested in the heater, but travels entirely through the heater and on back to the yarn feed rolls, and that the yarn is not heated in an untwisted condition in the heater [24]. While there was testimony by Armitage and De-Moncuit that the ARCT heater tube might slow down or "brake" the travel of the twist, these witnesses stated categorically that this heater tube would not stop the travel of the twist in the heater so as to provide for heating a length of

---

21. Ibid, pp. 19, 20.

22. Examinations of pp. 8, 12, and 16 of Exhibit No. 724.

23. Ibid, pp. 18, 19 and 20. One of these prior art patents, Heberlein 2,463,620 (now expired) was introduced during discovery depositions and designated Exhibit No. 342.

24. Waters' deposition of November 16, 1971, pp. 137, 148. See also affidavits of Petrie and Robbins attached to Burlington's Group III *Motion for Summary Judgment;* Armitage deposition of December 16, 1971 at page 286; DeMoncuit deposition of July, 1971, at page 348.

yarn in an untwisted condition in the heater [25].

Although the construction of these claims is a question of law for this court, the plaintiffs contend that there is a genuine issue of fact as to the following two matters:

1. What degree of twist arrest is described by the patent claims?

2. What degree of twist arrest occurs within the heater of the ARCT FT machines?

The genuineness of the second alleged issue of fact will be considered first. Depositions of witnesses for the Throwsters contend that about two-thirds of the twist passes through the heaters, while depositions of witnesses for the plaintiffs contend that as little as one-third does. The Throwsters' witnesses have testified that this apparent reduction in twist is primarily due to the softening of the yarn by heat, while the plaintiffs' witnesses have testified that it is due to friction with the heater surface. In view of the admissions by the plaintiffs that most, but not all,[26] of the twist is arrested in the heater on the ARCT FT machines, none of these disputes are material to this motion.

However, since the evidence on a motion for summary judgment should be construed most favorably toward the party opposing the motion, this court will consider, for the sake of further analysis, that as little as one-third of the twist passes through the heater.

Thus, the second alleged issue of fact is not genuine and therefore is not sufficient to foreclose a grant of summary judgment.

The court now comes to the first alleged issue of fact. In determining genuineness, the court may resort to the patent specification, drawings, and file wrapper. In deciding whether a genuine issue of fact exists as to what degree of twist arrest is described by the patent claims, the court, in resolving this question of law, is mindful of the two opposing viewpoints: the Throwsters' contention that the file wrapper indicates that *all* twist must be arrested in the heater and the plaintiffs' contention that only *most* twist must be arrested in the heater.

In deciding this question, the court should resolve ambiguities in a manner which will preserve the patent since any such ambiguities must be cast most favorably toward the party opposing the motion for summary judgment and here the patent owner is the opposing party. However, the court cannot add words that are not there. Standard Coil Products Co. v. General Electric Co., 306 F.2d 319, 322–323 (2d Cir. 1962); Reese v. Elkhart Welding & Boiler Works, 447 F.2d 517 (7th Cir. 1971); Smith, Kline & French Laboratories v. Clark & Clark, 157 F.2d 725 (3d Cir. 1946), cert. den., 329 U.S. 796, 67 S.Ct. 482, 91 L.Ed. 681. Nor may the court enlarge the meaning of the claims. Any interpretation must be fairly and

---

25. Armitage deposition of March 1, 1972, pp. 68–72. DeMoncuit deposition of July, 1971, at page 351.

26. For instance, in his deposition of November 16, 1971, Robert Waters, Executive Vice President of ARCT, Inc. (the Greensboro, N. C., corporation handling all sales of ARCT FT machines in the USA) testified: "Q. (By Mr. West)—You said that the twist traveled through the heater down to the yarn feeding attachment?
A. Yes, sir.
Q. And the twist in the yarn is arrested at the yarn feeding attachment?

A. Yes, sir.
Q. And is that an important function of the first yarn feeding attachment?
A. Yes."
Dr. Armitage, in the deposition of December 16, 1971 (p. 286), also admitted that he had *no present knowledge of any ARCT FT machine that confined the bundle of yarn to arrest the twist at a point within the heating medium* to prevent the twist from feeding to the bundle of yarn in the heater in advance of the confining point. (Emphasis added).

reasonably supported both by the language chosen by the patent applicant in the file wrapper and by the scope of the invention disclosed in the specification. In Dominion Magnesium Ltd. v. United States, 320 F.2d 388, 394, 162 Ct.Cl. 240 (1963), the court said:

> It is said that patent claims are to be construed liberally, but this does not mean that the language of a claim is to be given the broadest liberal meaning to which it is susceptible.

However, substance is not to be subordinated to form where doing so will deprive a patent owner of the benefit of the invention or discovery. Up-Right, Inc. v. Safeway Products, Inc., 315 F.2d 23, 27 (5th Cir. 1963), cert. den., 375 U. S. 831, 84 S.Ct. 76, 11 L.Ed.2d 62. A patentee, nevertheless, should not be allowed to stretch his words so that they are inclusive when infringement is being considered and restrictive when validity is being challenged by disclosure of the prior art. Chicago Steel and Foundry Co. v. Burnside Steel and Foundry Co., 132 F.2d 812, 815 (7th Cir. 1943).

In order to determine whether there is a file wrapper estoppel existing against the patent owner as to whether *all* or only *most* twist must be stopped in the heater, the court feels it is necessary to examine the file wrapper in great detail.

### FINDINGS OF FACT AS TO FILE WRAPPER ESTOPPEL

1. United States Patent 2,741,893, entitled "Method and Apparatus for Producing Crinkled Yarn" in the name of Louis Vandamme (now deceased) and Louis Rouyer as inventors was issued to Chavanoz by the Patent Office on April 17, 1956, based on U.S. application Serial No. 331,158 which had been filed in the Patent Office on January 14, 1953. It expired on April 17, 1973. The patent relates to false twisting thermoplastic yarn by means of a spindle, heat setting the yarn in twisted configuration and untwisting the yarn.

2. Prior to the grant of said patent, the application had been rejected by the Examiner on three separate occasions, namely, on October 19, 1953, February 21, 1955 and September 9, 1955.

3. The application was originally presented to the Examiner with six claims, the text of which is as follows:

1. The method of producing a crinkled yarn composed of thermoplastic filaments which comprises advancing the yarn and applying to the advancing yarn a false twist under conditions to advance along the yarn contra to the direction of feed thereof to a setting zone and setting the twist in said zone.

2. The method of producing a crinkled yarn composed of thermoplastic filaments, which comprises passing said yarn through a setting zone, applying a false twist to the yarn in a twisting zone after emerging from said setting zone under conditions to cause the twist to advance along the yarn contra to the direction of feed into said setting zone where it becomes set thereon, to disappear again as the yarn passes the twisting zone.

3. The method set forth in claim 1 in which the setting zone contains hot water.

4. The method set forth in claim 1 in which the setting zone contains steam.

5. Apparatus for producing crinkled yarn, comprising a vessel containing a setting agent, means feeding the yarn through said setting vessel, a rotating member adapted to produce a false twist, means feeding the yarn from said vessel through said rotating member whereby the twist advances in said yarn contra to the direction of feed into said vessel where it becomes set and then disappears as the yarn passes through said rotating member.

6. A crinkled yarn composed of thermoplastic filaments and produced by the process defined in claim 1.

4. The original claims were rejected by the Examiner on October 19, 1953, as unpatentable over four prior United States Patents, viz., Heberlein et al., 2,463,618; Heberlein, 2,463,620; Stockly (1), 2,475,922; and Stockly (2), 2,477,909.

5. On November 18, 1953 the applicant filed a response in the Patent Office in which original claims 1 and 6 were cancelled and claims 2–5 were amended and presented to the Examiner in the following form (words deleted by the amendments being shown with dashes and added words being underlined):

2. The method of producing a crinkled yarn composed of thermoplastic filaments, which comprises passing said yarn through a setting zone, applying a false twist to the yarn in a twisting zone after emerging from said setting zone under conditions *and while unconfined between said setting zone and said twisting zone* to cause the twist to advance along *feed backwardly in* the yarn contra to the direction of feed into said setting zone where it becomes set thereon, to disappear again as the *therein and to be removed again after the* yarn passes the twisting zone.

3. The method set forth in claim 1 *2* in which the setting zone contains hot water.

4. The method set forth in claim 1 *2* in which the setting zone contains steam.

5. *Apparatus for producing crinkled yarn, comprising a vessel containing a setting agent, means feeding the yarn through said setting vessel, a rotating member adapted to produce a false twist, means feeding the yarn from said vessel in an unconfined path through said rotating member whereby the twist* advances *in said yarn* contra to the direction of feed *can freely feed backwardly* into said vessel where it becomes set and *is* then dis-

appears *removed* as the yarn passes through *beyond* said rotating member.

6. In presenting the response of November 18, 1953, the applicant made the following statement to the Examiner:

The important feature of applicants' invention is to allow the twist produced by the false twister to feed backwardly to the setting zone where it becomes set. For this purpose it is necessary that the yarn be unimpeded by feed rollers, driers, or other equipment between the false twister and the setting zone; otherwise the twist would be prevented from feeding backwardly along the yarn as claimed.

7. On February 21, 1955 the Examiner rejected the amended claims which had been presented by the applicant on November 21, 1953 over the aforesaid Heberlein and Heberlein et al. patents as well as the following four patents: Finlayson et al. (1), 2,089,199; Finlayson et al. (2), 2,111,211; Finlayson et al. (3), 2,244,832; and Dreyfus, 2,111,209.

8. On August 18, 1955 the applicant filed a response to the Examiner's action of February 21, 1955 in which the applicant cancelled the four amended claims which had been presented to the Examiner on November 18, 1953 and substituted for them the following three claims:

7. The method of producing a crinkled yarn composed of thermoplastic filaments, which comprises passing said yarn through a heating medium, applying a false twist to the yarn in a twisting zone after emerging from said heating medium and while unconfined between said heating medium and said twisting zone to cause the twist to feed along the yarn backwardly into said heating medium, and confining the yarn at a point within said heating medium to prevent the twist from feeding to the yarn in said medium in advance of the confining point, whereby the twist becomes set between the confining point and the

false twisting zone and is removed again after the yarn passes the twisting zone.

8. The process set forth in claim 7 in which the heating medium is hot water.

9. Apparatus for producing crinkled yarn, comprising a vessel containing a heating medium, means feeding the yarn through the medium in said vessel, a rotating member adapted to produce a false twist, means feeding the yarn from said vessel in an unconfined path through said rotating member whereby the twist in said yarn can freely feed backwardly into said vessel, and confining means in said vessel confining the yarn to prevent feeding of the twist to the yarn in said medium in advance of said confining means whereby the twist is set in the yarn between said confining means and said rotating member and is then removed after the yarn passes beyond said rotating member.

9. Claims 7 and 8 as presented on August 18, 1955 contained the following phrase which had not been present in any of the claims submitted to the Examiner prior to that time:

confining the yarn at a point within said heating medium to prevent the twist from feeding to the yarn in said medium in advance of the confining point.

10. Claim 9 as presented on August 18, 1955 contained the following phrase which had not been present in any of the claims presented to the Examiner prior to that time:

confining means in said vessel confining the yarn to prevent feeding of the twist to the yarn in said medium in advance of said confining means.

11. In presenting amended claims on August 18, 1955, the applicant offered the following explanation:

It is to be noted that an important feature of the present invention is the provision of the roller 6 which consti-

tutes a confining means in the heating medium (hot water) and prevents the twist from passing to the horizontal portion of the yarn between the rollers 5 and 6. This feature permits a high false twist to be imparted to the yarn to be set therein while at the same time it provides for plasticizing the yarn by the treatment throughout a fairly long path in the hot water so that it is in a plasticized condition for receiving the twist after it passes the roller 6. By confining the twist to the distance between the roller 6 and the false twister 7 a comparatively high twist can be imparted to the yarn.

12. The "important feature" described by the applicant on August 18, 1955 was different from the "important feature" which the applicant had described to the Examiner in his response filed on November 18, 1953.

13. On September 9, 1955 the Examiner rejected the claims which had been presented on August 18, 1955 over the aforesaid Finlayson (2) and (3) patents, the aforesaid Dreyfus patent, and the aforesaid Stockly patents, stating that this rejection was "MADE FINAL".

14. On February 20, 1956 the applicant submitted a response in which claims 7 to 9 were amended to present in effect a fourth version of claims for consideration by the Examiner, the claims reading as follows:

7. The method of producing a crinkled yarn ~~composed of~~ *from a bundle of substantially parallel, synthetic* thermoplastic filaments, which comprises passing said ~~yarn~~ *bundle* through a heating medium, applying a false twist to the ~~yarn~~ *bundle* in a twisting zone after emerging from said heating medium and while unconfined between said heating medium and said twisting zone to cause the twist to feed along the ~~yarn~~ *bundle* backwardly into said heating medium, and confining the ~~yarn~~ *bundle to arrest the twist* at a point within said heating medium to prevent the twist

from feeding to the ~~yarn~~ *bundle* in said medium in advance of the confining point, whereby the ~~twist~~ *crinkle* becomes set between the confining point and the false twisting zone and ~~is~~ *the twist disappears* ~~removed~~ again after the ~~yarn~~ *bundle* passes the twisting zone.

8. The process set forth in claim 7 in which the heating medium is hot water.

9. Apparatus for producing crinkled yarn *from a bundle of substantially parallel, synthetic, thermoplastic filaments*, comprising a vessel containing a heating medium, means feeding the ~~yarn~~ *bundle* through the medium in said vessel, a rotating member adapted to produce a false twist, means feeding the ~~yarn~~ *bundle* from said vessel in an unconfined path through said rotating member whereby the twist in said yard can freely feed backwardly into said vessel and ~~confining~~ *twist arresting* means in said vessel confining the ~~yarn~~ *bundle* to prevent feeding of the twist to the ~~yarn~~ *bundle* in said medium in advance of said ~~confining~~ *arresting* means whereby the ~~twist~~ *crinkle* is set in the ~~yarn~~ *filaments* between said *arresting* means and said rotating member and ~~is then removed~~ *the twist disappears* after the ~~yarn~~ *bundle* passes beyond said rotating member.

15. Claim 7 as presented to the Examiner on February 20, 1956 contained the following phrase which had not been present in any of the claims presented to the Examiner prior to that time:

to arrest the twist.

16. Claim 9 as presented on February 20, 1956 contained the following phrase which had not been present in any of the claims presented to the Examiner prior to that time:

twist arresting means.

17. In the "Remarks" accompanying the amendment of February 20, 1956, the applicants' attorney used this language with respect to the amended claims:

> This amendment is made *as the result of an interview with the Primary Examiner* and is intended to place the case in condition for allowance. It will be noted that the claims have been amended to specify that the bundle is composed of substantially parallel, thermoplastic, continuous filaments, also that the crinkle is set in the twisted bundle. The crinkle remains but the twist disappears after the bundle passes the false twister. *The claims also specify that the twist arresting device stops the twist in the heating zone* so that *a substantial length of the bundle in the heating zone remains untwisted* with the filaments substantially parallel. Due to the fact that synthetic thermoplastic filaments are poor heat conductors *it is important to heat the bundle while in untwisted condition.* Otherwise, the filaments are not uniformly heated and brought up to the desired temperature because they are too closely packed for the heat to penetrate the bundle. In the present case, by arresting the twist [in advance of] the preheating area, efficient operation takes place. *None of the citations discloses a construction wherein* synthetic, thermoplastic, continuous *filaments are heated in an untwisted parallel bundle* prior to the false twisting and in the absence of a chemical treating medium. (Emphasis added).

Following the filing of this amendment, the three substitute claims in the application were allowed by the Examiner on March 2, 1956, and the patent issued on April 17, 1956, containing only these three claims.

18. In the operation of ARCT FT machines alleged to infringe U. S. Patent 2,741,893, at least some of the twist imparted to the yarn by the false twist spindle normally feeds back to the yarn feed device positioned upstream of a heater positioned between that yarn feed device and the false twist spindle.

(Robbins and Petrie Affidavits; Waters deposition, November 16, 1971, page 137, lines 12–14; Robbins deposition, March 12–13, 1973, pages 40 to 41 and 329 and 335; Petrie deposition, March 15, 1973, pages 107 to 110 and 194 to 197; ARCT-France and DMRC/Chavanoz responses served May 30, 1973 to Burlington Request for Admissions served April 2, 1973, see responses to Requests Nos. 1 and 10; and DMRC/Chavanoz Answers to Interrogatories with Respect to Requests for Admissions, Interrogatories served July 2, 1973, see answers to Interrogatories 3 and 6).

19. In the operation of ARCT FT machines alleged to infringe U.S. Patent 2,741,893, at least 34% of the number of turns of twist per inch (imparted to the yarn by the false twist spindle is feed to the yarn *upstream* of the heater. (Robbins deposition, March 12–13, 1973, pages 329–335; ARCT-France response served May 30, 1973 to Burlington Request for Admissions served April 2, 1973—see response to Request No. 5, DMRC/Chavanoz response served May 30, 1973 to Burlington Request for Admissions served April 2, 1973.)

20. In the operation of ARCT FT machines alleged to infringe U.S. Patent 2,741,893 there is *no single point in the heater at which the yarn changes from a twisted to an untwisted configuration.* (DMRC/Chavanoz answers to Throwsters' Interrogatories with Respect to Requests for Admissions—Interrogatories served July 2, 1973, see answer to Interrogatory No. 11.)

## CONCLUSIONS OF LAW

A. Based upon the foregoing undisputed findings of fact, especially the attorney's remarks accompanying the last amendment after an interview with the Examiner and before allowance of the patent application, the conclusion appears inescapable to this court that the Patent Office granted the patent with the limitation that the patented invention cover only devices in which *all*, not *most*, twist must be arrested in the heater (see the horizontal zone between points 5 and 6 of the patent drawing).

B. The court does not have to determine why the Examiner rejected the claims of the patent application before it contained the amendments or whether he was justified in doing so. In Smith v. Magic City Kennel Club, Inc., 282 U.S. 784, 789, 51 S.Ct. 291, 293, 75 L.Ed. 707, 712 (1931), the Supreme Court said: "Whether the examiner is right or wrong in rejecting the original claim, the court is not to inquire." To the contrary, the court need merely determine whether limitations were introduced into the patent application following rejections by the Examiner because the applicants, having limited their claims by amendment and accepted a patent, bring themselves within the doctrine of file wrapper estoppel. Any limitation imposed by the Patent Office must be regarded as material, and that limitation, if accepted by the inventors, especially if it was introduced after the patent application was persistently rejected, must be strictly construed against the inventors. Smith, supra, 282 U.S., at 790, 51 S.Ct. 291, 75 L.Ed., at 712.

C. Since the patented applicants were their own lexicographers and their own grammarians, they could have said:

The claims also specify that the twist arresting device stops *most* of the twist in the heating zone . . . a substantial length of the bundle in the heating zone remains *largely* untwisted . . . it is important to heat the bundle while in *substantially* untwisted condition. (Words added).

However, they did not say so, the Patent Office would not allow it, and this court will not add these words which are not there. This court has attempted to interpret the meaning of the claims both fairly and reasonably as supported by the language chosen by the patent applicants and appearing in the file wrapper. The inventors have not been deprived of the benefit of their advancement in the pertinent art because it is a narrow one.

■ D. This motion is considered after all the testimony on the claims of this patent have been exhausted in the discovery processes. Counsel for plaintiffs at one time stated they would rely on the inventors and the experts to support its position. Of the inventors, one is dead, and the other was too sick for the taking of his deposition in France. (The court was in France, Rogatory Letters had been issued to the French Court, the depositions were scheduled, cancelled by the French Court because of illness of the witness, as evidenced by an unsworn doctor's statement). Counsel for plaintiffs now reveal the surviving inventor cannot come to the United States to testify. This leaves the testimony of the experts.[27] This court, not having seen Dr. Fox in person, will accord him, or others of like claim, an expert, mindful, however, of the sage advice given to bench and bar in Fried, Krupp Atkien-Gesellshaft v. Midvale Steel Co., 191 F. 588, 591 (3d Cir. 1911):

> We deem it proper, however, to say for the guidance of patent practitioners in this circuit that it should be borne in mind that infringement is not only a question of fact, but is a tort or wrong, the burden of establishing which, as in all torts, clearly rests on those who charge such wrong. The absence of actual fact proof is not met by the presence of expert speculations no matter how voluminous. In this particular case the whole superstructure of the vast mass of expert testimony, in the last analysis, depends on what the Midvale Company did when making armor-plate as testified to by Leonard and Ross. They were the only witnesses who saw and testified thereto, and, when the judge below became convinced that these two witnesses did not prove facts which showed infringement, he rested, and could rightfully rest, his decision on that ground.

■ And, as it was pointed out by the Court of Appeals for the Second Circuit (Judges Rogers, Manton, and Learned Hand) affirming District Judge Augustus N. Hand in Kohn v. Eimer, 265 F. 900, 902 (2d Cir. 1920):

> We have not the slightest wish to minimize the vital importance of expert testimony in patent suits, or to suggest that we are not absolutely dependent upon it within its proper scope; but that scope is often altogether misapprehended, as the appellant has misapprehended it here. Specifications are written to those skilled in the art, among whom judges are not. It therefore becomes necessary, when the terminology of the art is not comprehensible to a lay person, that so much of it as is used in the specifications should be translated into colloquial language; in short, that the judge should understand what the specifications say. This is the only permissible use of expert testimony which we recognize. When the judge has understood the specifications, he cannot avoid the responsibility of deciding himself all questions of infringement and anticipation, and the

---

27. Originally, in opposition to this motion, DMRC and Chavanoz have relied on an affidavit of a textile expert, Dr. Kenneth R. Fox, who gives a legal interpretation of the claims of the patent, and portions of the testimony of Dr. Armitage and Mr. De-Moncuit. The affidavit of the expert Fox does not dispute the statements of the Petrie and Robbins affidavits "that they have observed on all ARCT machines—employed by Burlington, the yarn is in a twisted condition before entering the heater". (Fox affidavit, paragraph 14.) The Fox affidavit does, however, argue that even if the yarn processed by Burlington on the ARCT machines is in a twisted condition before entering the heater, this "would not establish non-infringement", stating:
* * However, even if this is so, it would not establish non-infringement; the claims of U.S. patent 2,741,893 and the benefits of the invention do not require that all twist be *restrained* in the heater. Moreover, the naked eye cannot discern to what extent twist is arrested within the heating medium. (Fox affidavit, paragraph 14).
This statement is speculative, is in the nature of a legal conclusion, and it does not establish any genuine issue of fact.

testimony of experts upon these issues is inevitably a burdensome impertinence.

Again, Norton v. Jensen, 49 F. 859, 864 (9th Cir. 1892):

> Expert testimony is admissible to explain the several drawings, models, and machines that are exhibited upon the trial, their operation, purpose, and effect, and the differences which exist in the various devices involved in their construction. The opinion of an expert is, in certain cases, admissible in evidence, but it is not conclusive upon the courts. It is to be considered as the judgment and opinion of a person who has had extensive practice, education, and knowledge in relation to the particular subject upon which his testimony is given. If the reasons given by the expert witness are deemed reasonable and satisfactory, the court may adopt them, but, if they are unsatisfactory, the court will discard the testimony, and act upon its own knowledge and judgment. It is always the duty of the courts to construe the patents by a reference to the language of the claims and an examination of the specifications and drawings accompanying the same.

See also National Transformer Corp. v. France Mfg. Co., 215 F.2d 343, 358 (6th Cir. 1954):

> The only permissible use of expert testimony is to assist the trial judge in understanding what the specifications say. "When the judge has understood the specifications, he cannot avoid the responsibility of deciding himself all questions of infringement and anticipation, and the testimony of experts upon these issues is inevitably a burdensome impertinence." Kohn v. Eimer, supra, 265 F., at 902. In this case, the trial judge heard an abundance of testimony upon all patents in issue and a multitude of patents referred to as prior art and anticipatory.

The testimony of the experts give "conclusions and opinions", not facts, as to infringement and give interpretations of the prior art which is readily understandable by this court without their aid. Thus, they do not raise any genuine issue of fact which would preclude a motion for summary judgment.

E. All of the original claims submitted with the patent application were rejected. It was not until the "arrest the twist within said heating medium" feature was inserted into the claims that the Examiner would recognize *anything* inventive in the patent application. This feature was strongly urged by the applicants as the distinction from the prior patents cited by the Examiner:

> None of the citations discloses a construction wherein . . . filaments are heated in an untwisted parallel bundle.

The twist arresting feature must be regarded as material and, since the amendments operate as a disclaimer, they must be strictly construed against the patent owner.

F. Thus, the patent owner is estopped from giving the term of art, "arrest the twist", in the patent claims any different meaning than that which appears incontrovertibly clear in the file wrapper. Therefore, this court concludes that there is no genuine issue of fact that the term "arrest the twist" means "arrest *all* the twist" and not "arrest *most of* the twist".

G. So construing the patent claims, this court finds that the claims of U.S. Patent 2,741,893 (now expired) were not infringed, as a matter of law, by the ARCT FT machines. Since the doctrine of file wrapper estoppel applies against any charge of literal direct infringement and since it therefore does not matter whether or not a charge of direct infringement under the doctrine of equivalents is made, entry of a summary judgment of non-infringement is appropriate.

The motion is granted.

And it is so ordered.

April 17, 1956    L. VANDAMME ET AL    2,741,893

METHOD AND APPARATUS FOR PRODUCING CRINKLED YARN

Filed Jan. 14, 1953

INVENTORS
*Louis Vandamme*
BY *& Louis Rouyer*

*ATTORNEY*